**BLACKSTONE PARK IMPROVEMENT ASSOCIATION et al.**

v.

**STATE of Rhode Island BOARD OF STANDARDS AND APPEALS et al.**

No. 82–139–A.

Supreme Court of Rhode Island.

Aug. 5, 1982.

Edwards & Angell, Deming E. Sherman, Providence, for Blackstone Park Imp. Ass'n.

Henry J. Almagno, Cranston, for City of Providence.

Adler, Pollock & Sheehan, Inc., Peter Lawson Kennedy, Providence, for State of R. I., Bd. of Standards.

## OPINION

KELLEHER, Justice.

This appeal from a decision of the Rhode Island Building Code Board of Standards and Appeals (the Board), before us upon certification by the Superior Court pursu-ant to G.L.1956 (1969 Reenactment) § 9–24–25, raises a question of first impression in this jurisdiction: whether the State of Rhode Island is subject to the zoning ordi-nances of a local municipality. The contro-versy in the instant case has been sparked by the state's proposal to build an addition to the Dr. John E. Donley Rehabilitation Center (the Donley Center or the Center) on its current premises at 249 Blackstone Bou-levard in Providence. The Donley Center, first established in 1943 and referred to as the "curative centre," P.L.1943, ch. 1362, §§ 1 and 20, is a state-owned and operated treatment facility within the purview of the Department of Labor, Division of Workers' Compensation. It provides rehabilitative services to injured workers throughout the state pursuant to the Workers' Compensa-tion Act. General Laws 1956 (1979 Reen-actment) §§ 28–38–4 and 28–38–19. The plaintiffs in this action consist of the Black-stone Park Improvement Association (the association), a nonbusiness corporation com-posed of residents living in the neighbor-hood surrounding the Donley Center, sever-al individual property owners residing with-in 200 feet of the Donely Center facility, and the city of Providence.

On February 10, 1982, the State Building Commissioner, acting under the authority of the State Building Code, as codified in title 23, chapter 27.3 of the General Laws (the building code), issued a building permit to the state for the construction of a 7,650-square-foot addition to the existing Donley Center facility at a projected cost of $1.135 million. The architectural plans for this expansion contemplate the erection of a two-story brick building that will be slight-ly larger than the existing structure. The plaintiffs appealed the issuance of the per-mit to the Board of Standards and Appeals on the ground that it was improperly grant-ed because the proposed addition fails to conform to Providence's zoning regula-tions.[1] On March 8, 1982, the Board denied

---

1. The Board is empowered by G.L.1956 (1979 Reenactment) § 23–27.3–127.1, as enacted by P.L.1981, ch. 236, § 4, to hear appeals of per-sons "aggrieved" by a decision of the State Building Commissioner. The state maintains that the Blackstone Park Improvement Associ-ation lacked standing to bring an appeal before the Board because it does not come within the

plaintiffs' appeals, concluding that it was without jurisdiction to consider the applicability of local municipal zoning requirements to state construction projects.

The Donley Center is presently situated in a residential neighborhood of predominantly single-family homes which has been designated as an R–1 (one-family) zone under the city's comprehensive zoning plan. The parties have stipulated that the Center's current operation on the premises constitutes a nonconforming use in that it is not one of the permissible uses for this zoning category enumerated by section 41 of the Zoning Ordinance of the City of Providence, ch. 544 (1979). The parties further agree that if the municipal zoning regulations are applicable to state agencies, the Donley Center would be required to obtain the approval of the Providence Zoning Board of Review before it could proceed with construction of the proposed addition.[2]

The state takes the position that as the sovereign it is absolutely immune from the zoning requirements of municipalities within its borders. The plaintiffs counter this assertion by reference to the State Building Code, which they argue expressly subjects state buildings, including the Donley Center construction project, to the requirements of municipal zoning regulations governing the location, use, type, and height of buildings or structures.

The General Assembly first promulgated a statewide building code to control the construction, alteration, and rehabilitation

of buildings and structures in 1973. Public Laws 1973, ch. 138. The current version of the building code to which plaintiffs refer us is the result of recent legislation that formally adopted, with some modifications, the provisions of the 1978 BOCA Basic Building Code, drafted by the Building Officials & Code Administrators International, Inc. See P.L.1981, chs. 232 and 236. As with the model code, Rhode Island's code sets forth uniform, minimal safety standards with regard to the structural aspects of construction and alteration of buildings and structures within this jurisdiction. In its purpose clause the General Assembly has expressed the conviction that the health, safety, and welfare of the citizens of Rhode Island will be furthered by the enactment of a "modern uniform building code which takes into account current scientific and engineering knowledge and allows for utilization of modern materials and methods of construction." Section 23–27.3–100.1.2, as amended by P.L.1981, ch. 236, § 2. To this end § 23–27.3–101 specifies that the provisions of the code apply to "all buildings and structures and their appurtenant constructions," and, moreover, that it

"shall apply with equal force to municipal and state authorities established by the legislature and private buildings and structures; except where such buildings and structures are otherwise specifically provided for by statute."

In particular, plaintiffs rely on § 23–27.-3–101.3, as amended by P.L.1976, ch. 256, § 1, to support their contention that the

---

parameters of building code § 23–27.3–201. This provision lists three types of parties any one of which may qualify as an "aggrieved party" for purposes of appeal to the Board: (1) an owner of a building or structure that is subject to action or failure of action by a local building official, the State Building Commissioner, or a local board of appeals; (2) property owners within 200 feet of the property line that is the subject of any appeal; and (3) the State Building Commissioner relative to action or failure of action by a local building official. The state concedes that it would be futile to press its claim given the obvious standing of the city of Providence and the individual plaintiffs, all of whom own property within 200 feet of the Donley Center and joined with the association in its appeal to the Board.

**2.** Section 23 of the Providence zoning ordinance prohibits extension of any existing nonconforming use except upon approval of the zoning board. Subsection 3(a) of that provision states:

"3. *Additions, Enlargements or Moving*
(a) A building or structure nonconforming as to regulations for use or lot area per dwelling unit shall not be added to or enlarged in any manner unless such building or structure, including such addition and enlargement is made to conform to the use and area per dwelling regulations of the zone in which it is located."

state must comply with Providence's land-use ordinance or obtain the approval of the city Zoning Board of Review. Addressing the issue of zoning restrictions, this provision states:

> "When the provisions herein specified for structural strength, adequate egress facilities, sanitary conditions, equipment, light and ventilation, and fire safety conflict with the local zoning ordinances, this Code shall control the erection or alteration of buildings. In respect to location, use and type, permissible area and height, the local zoning ordinance shall control."

■ The Board rejected plaintiffs' interpretation of this section, determining that the building code addresses the interplay between its provisions and municipal zoning regulations only insofar as the structural facet of construction or alteration of buildings and structures is concerned. Accordingly, it was of the opinion that the reference in the last sentence of this section to the word "use," when construed within the overall framework of the code, "deals with structural aspects of buildings and not with land use." We agree.

The BOCA counterpart to § 23–27.3–101.3 differs from the Rhode Island version in that it gives priority to code provisions governing location, use, permissible area, and height when they are more restrictive than local zoning law and relate to the structural, fire, and sanitary safety aspects of buildings or structures.[3]

Unfortunately, the BOCA provisions are not accompanied by official commentary, and we have been unable to find cases or other secondary sources that discuss the application of the 1978 zoning-restrictions proviso.[4] However, after reviewing the various articles and individual sections of our own State Building Code in conjunction with their BOCA complements, we are convinced that plaintiffs have misconceived the import of § 23–27.3–101.3. As is true of the BOCA code, Rhode Island's code establishes nine use groups for buildings and structures predicated upon the purpose for which a particular building or structure is used. Sections 23–27.3–201.3 and 202.1. For each such "use group" there are detailed specifications concerning the height, permissible area, fire-protection requirements, and structural integrity of buildings and structures within the group. *E.g.*, §§ 23–27.3–203.1 to 211.2. Given this statutory scheme, we believe the Board is correct in its finding that the term "use" as defined in the building code only "addresses itself to the hazards created by certain occupancies of structures and the corresponding structural safeguards which should be undertaken to protect the public's health, safety and welfare." The citation to municipal zoning ordinances controlling the "location, use and type, permissible area and height" of buildings and structures must be interpreted in conjunction with the opening sentence of the conflicts proviso as well as with the overriding purposes of the building code.

Furthermore, it must be borne in mind that in contrast to the focus of zoning laws, building codes generally are designed to promote the public welfare by focusing upon the safety and structure of buildings; they regulate the technical, engineering,

---

**3.** 1978 BOCA Basic Building Code § 101.5 states:

> "Zoning restrictions: When the provisions herein specified for structural, fire and sanitary safety are more restrictive than the zoning law, this code shall control the erection or alteration of buildings or structures, in respect to location, use, permissible area and height; but in any case, the most rigid requirements of either the building code or the zoning law shall apply whenever they may be in conflict."

**4.** We are aware of only one case in which a court has had to apply a BOCA-code-conflicts proviso. In *City of Champaign v. Kroger Co.*, 88 Ill.App.3d 498, 43 Ill.Dec. 661, 410 N.E.2d 661 (1980), the Appellate Court of Illinois construed § 101.4 of the 1970 BOCA code and its 1973 supplement, one of the predecessors of the 1978 § 101.5 BOCA-conflicts provision. This earlier version also resolved clashes between building-code requirements and zoning laws in favor of the more restrictive standards. In *Champaign*, however, the court was confronted with such a clash only in the context of two seemingly inconsistent zoning ordinances enacted by a single municipality.

and scientific details of construction. Zoning regulations, on the other hand, regulate the use of buildings, structures, and lands according to various purposes and therefore tend to deal with building construction from the standpoint of location, height, number of stories, lot sizes, and open-space requirements. *Taschner v. City Council of Laguna Beach*, 31 Cal.App.3d 48, 60, 107 Cal.Rptr. 214, 224–25 (1973).

In short, when § 23–27.3–101.3 is construed within its proper framework, it is apparent that the language here in question merely specifies the line of demarcation between building-code specifications and zoning requirements. It does not, as plaintiffs assert, expressly subordinate state buildings and building-construction projects to municipal land-use zoning regulations. Indeed, we conclude that the State Building Code is silent with respect to the intergovernmental-conflicts issue this court must today resolve because of the addition's nonconforming-use status and plaintiffs' allegations that the state, like anyone else seeking to extend a nonconforming use, must comply with local land-use regulations or obtain a variance thereto from the appropriate municipal regulatory authorities.

Given the lack of express legislative pronouncements on the subject, the state urges us to follow the approach taken by some of our New England sister states as well as other states, which approach resolves such governmental conflicts in favor of the superior sovereign. *E.g., Mayor of Baltimore v. State*, 281 Md. 217, 378 A.2d 1326 (1977); *County Commissioners of Bristol v. Conservation Commission of Dartmouth*, 380 Mass. 706, 405 N.E.2d 637 (1980); *City of Portsmouth v. John T. Clark and Son of New Hampshire, Inc.*, 117 N.H. 797, 378 A.2d 1383 (1977); *City of Sante Fe v. Armijo*, 96 N.M. 663, 634 P.2d 685 (1981); *In re Suntide Inn Motel*, 563 P.2d 125 (Okl.1977); *Morse v. Vermont Division of State Buildings*, 136 Vt. 253, 388 A.2d 371 (1978). In other words, the state would have this court presume from the absence of statutory language to the contrary that the General Assembly intended the Donley Center to be absolutely immune from Providence zoning restrictions merely because, as an arm of the state, it occupies a superior position within the governmental hierarchy.

The so-called sovereign-immunity rule espoused by the state might fairly accurately be characterized as hornbook law. Historically it has resulted in judgments upholding state agencies' proposed use in contravention of municipal zoning ordinances. *See* 2 Anderson, *American Law of Zoning*, § 12.-06 (2d ed. 1976); 8 McQuillan, *Municipal Corporations*, § 25.15 (3d ed. 1976). However, in the last decade the rule has been scrutinized by legal scholars and noted jurists with increasing criticism. One such commentator in a leading law-review note was quick to point out that the rule is myopic because it fails to recognize that municipalities acting under the authority of state zoning enabling acts are "equally 'agents of the state.'" The validity of the rule, the author further commented, is dubious because it simply "begs the critical question of which agent of the sovereign should prevail where there are overlapping and conflicting territorial jurisdictions." (Footnote omitted.) Comment, *Governmental Immunity From Local Zoning Ordinances*, 84 Harv.L.Rev. 869, 877 (1971); *see generally*, Wolff, *The Inapplicability of Municipal Zoning Ordinances to Governmental Land Uses*, 19 Syracuse L.Rev. 698 (1968).

Critiques such as these have prompted many courts over the last several years to question seriously the continued viability of the sovereign-immunity rule in today's highly urbanized society. The reasoning of the court in *City of Temple Terrace v. Hillsborough Association for Retarded Citizens, Inc.*, 322 So.2d 571, 578–79 (Fla.Dist.Ct.App. 1975), *aff'd*, 332 So.2d 610 (Fla.1976), is most compelling:

"The old tests were adopted at a time when state government was much smaller. The myriad of agencies now conducting the functions of the state have necessarily resulted in a diminution of centralized control. The decision of a person administering an outlying function of a state agency with respect to the site

where this function should be performed is not necessarily any better than the decision of the local authorities on the subject of land use.  * * *

"Our burgeoning population and the rapidly diminishing available land make it all the more important that the use of land be intelligently controlled. This can only be done by a cooperative effort between interested parties who approach their differences with an open mind and with respect for the objectives of the other."

The tests to which the *Hillsborough* court referred in addition to the superior sovereign rule are the "governmental or proprietary function" and the "eminent domain" tests. Both are approaches that in the past have also been utilized by some jurisdictions when confronting this type of knotty zoning question. The former analysis requires the reviewing court to determine whether the institutional use proposed is in the nature of a "governmental" function or a "proprietary" function. A political entity performing in a "governmental" capacity is, under this test, afforded unqualified immunity from conflicting municipal zoning regulations, whereas one operating solely in a "proprietary" capacity must comply with applicable zoning requirements. *E.g., City of Scottsdale v. Municipal Court*, 90 Ariz. 393, 368 P.2d 637 (1962); *Nehrbas v. Incorporated Village of Lloyd Harbor*, 2 N.Y.2d 190, 140 N.E.2d 241, 159 N.Y.S.2d 145 (1957). As its label suggests, the third method of analysis turns on whether or not a political unit has the power of eminent domain. The rationale for this standard is the presumption that the Legislature's grant of such power conclusively establishes the governmental entity's superiority in situations in which its proposed land use runs counter to local zoning provisions. *E.g., Mayor of Savannah v. Collins*, 211 Ga. 191, 84 S.E.2d 454 (1954); *City of Kirkwood v. City of Sunset Hills*, 589 S.W.2d 31 (Mo.Ct. App.1979).

These latter tests have likewise come under sharp attack in recent years. The governmental-proprietary-function analysis in particular has been considerably discredited as courts have realized that drawing the necessary distinction between the two classes of functions is no easy feat. Indeed it has proven so enigmatic a test that different courts have classified the same functions within each of these categories. *See City of Pittsburgh v. Commonwealth*, 468 Pa. 174, 178–79 n.4, 360 A.2d 607, 609–10 n.4 (1976) (proprietary-governmental-function analysis rejected because of difficulty in applying the distinctions); *Township of Washington v. Village of Ridgewood*, 26 N.J. 578, 584, 141 A.2d 308, 311 (1958) (distinction between governmental and proprietary function is purely illusory because whenever local government acts pursuant to its statutory authority it acts in the capacity of a government and not a private entrepreneur); *Governmental Immunity From Local Zoning Ordinances*, 84 Harv.L. Rev. at 869–74. More generally, all three traditional tests share a common flaw; they are overly simplistic and often lead to resolution of a multifaceted zoning-conflicts issue through the use of conclusive labels rather than through perceptive adjudication. *Brown v. Kansas Forestry, Fish and Game Commission*, 2 Kan.App.2d 102, ——, 576 P.2d 230, 232 (1978); *Brownfield v. State*, 63 Ohio St.2d 282, 285–86, 407 N.E.2d 1365, 1367–68 (1980); *City of Pittsburgh v. Commonwealth*, 468 Pa. at 180, 360 A.2d at 610–11.

▮ From this reevaluation process a fourth analytical tool has emerged, pioneered by the New Jersey Supreme Court. Striving to avoid the pitfalls of these other tests, the court in *Rutgers, State University v. Piluso*, 60 N.J. 142, 286 A.2d 697 (1972), fashioned a method of analysis designed to provide a flexible, reasoned approach that would consider the relationships of the competing governmental entities and the particular factual circumstances in which the zoning conflict arises. It relies in the first instance on the legislative intent with regard to the specific agency or function involved as "the true test of immunity." *Id.* at 152, 286 A.2d at 702. Although such intent ofttimes is obscured, it may be dis-

cerned from such factors noted by the *Rutgers* court as (1) the nature and scope of the instrumentality seeking immunity, (2) the kind of function or land use involved, (3) the extent of the public interest to be served, (4) the effect local land-use regulation would have upon the enterprise concerned, and (5) the impact upon legitimate local interest.

The competing governmental units in the *Rutgers* case consisted of the state university and the township in which one of the school's campuses was located. In an effort to alleviate a severe statewide shortage of public higher-education facilities, Rutgers University had been engaged in a substantial program of expansion that necessitated the construction of additional teaching buildings, student housing, and other facilities generally required by large universities. Carrying out this growth plan eventually brought the university squarely at odds with a local municipal zoning ordinance that restricted housing facilities for use by matriculated students and their families to a 500-unit ceiling. Examining the interests and objectives of these competing political entities under the rubric of its new test, the *Rutgers* court was of the opinion that the Legislature would not have intended the growth and development of this state educational institution to be obstructed or controlled by local municipalities; thus, the situation presented was one in which the "broader public interest is so important that immunity must be granted even though local interests may be great." *Id.* at 153–54, 286 A.2d at 703. But, the court cautioned, such immunity is not totally unfettered.

> "Even where it is found to exist, it must not * * * be exercised in an unreasonable fashion so as to arbitrarily override all important legitimate local interests. This rule must apply to the state and its instrumentalities as well as to lesser governmental entities entitled to immunity.

For example, it would be arbitrary, if the state proposed to erect an office building in the crowded business district of a city where provision for off-street parking was required, for the state not to make some reasonable provision in that respect. And, at the very least, even if the proposed action of the immune governmental instrumentality does not reach the unreasonable stage for any sufficient reason, the instrumentality ought to consult with the local authorities and sympathetically listen and give every consideration to local objections, problems and suggestions in order to minimize the conflict as much as possible." *Id.* at 153–54, 286 A.2d at 703.

Our research reveals that the *Rutgers* analysis, now commonly known as the "balancing-of-interests test," has thus far been embraced by at least nine other jurisdictions—Florida, Hawaii, Kansas, Michigan, Minnesota, North Dakota, Ohio, Pennsylvania, and South Dakota. *City of Temple Terrace v. Hillsborough Association for Retarded Citizens, Inc.*, 322 So.2d 571 (Fla. Dist.Ct.App.1975) *aff'd*, 332 So.2d 610 (Fla. 1976); *Kunimoto v. Kawakami*, 56 Haw. 582, 545 P.2d 684 (1976); *Brown v. Kansas Forestry, Fish and Game Commission*, 2 Kan.App.2d 102, 576 P.2d 230 (1978); *Dearden v. City of Detroit*, 403 Mich. 257, 269 N.W.2d 139 (1978); *Town of Oronoco v. City of Rochester*, 293 Minn. 468, 197 N.W.2d 426 (1972); *City of Fargo v. Harwood Township*, 256 N.W.2d 694 (N.D.1977); *Brownfield v. State*, 63 Ohio St.2d 282, 407 N.E.2d 1365 (1980); *City of Pittsburgh v. Commonwealth*, 468 Pa. 174, 360 A.2d 607 (1976); *Lincoln County v. Johnson*, 257 N.W.2d 453 (S.D.1977). It is also worthy of note that a similar balancing methodology has been endorsed by the drafters of the American Law Institute land-development code. *See* Model Land Dev. Code §§ 7–301 to 304 and 12–201 (1975).[5]

---

5.  Model Land Dev. Code § 7–304(2) authorizes the issuance of a permit for a land-development project notwithstanding local zoning ordinances to the contrary if the benefits of the project outweigh the detriments, if the interference with the local or state development plan is not substantial or unreasonable, and if the departure from zoning regulations is no more than is reasonably necessary for a substantial segment of the state population to obtain rea-

The New Jersey Supreme Court, to its credit, can now claim another adherent of its enlightened analysis, for today we adopt the balancing-of-interests test in cases involving intergovernmental zoning clashes. We are persuaded that it is the "fairest method" by which such conflicts can be resolved because it is sensitive to the needs and concerns of the competing governmental entities, potentially affected property owners, local residents, and the public as a whole and takes into consideration all of the salient factors that may properly influence the result. *City of Temple Terrace v. Hillsborough Association for Retarded Citizens, Inc.*, 322 So.2d at 578.

▪ After reviewing the record and the arguments of counsel, we believe that the case at bar is also one in which the "broader public interest is so important that immunity must be granted" to the state for purposes of its construction plans at the Donley Center site. The rehabilitative therapy provided by the Center to workers throughout the state who are, or may become, injured and who qualify for such treatment under our Workers' Compensation Act is of vital importance not only to workers and their families but also to the general public welfare and the state's economy. The interest of the state in ensuring that such services will be available to all qualified workers in need is paramount to the interests of the city of Providence and a small group of property owners and local residents who object to the expansion of a nonconforming use that has been in existence in the Blackstone Boulevard neighborhood since 1943.

Moreover, we do not understand plaintiffs to complain that the proposed expansion of the Center at its current site is unreasonable. If such an argument were to be made, it would be wholly untenable. The administrator of the Donley Center, Tina Caprio, testifying before the Board of Standards and Appeals, described the Cen-

ter's existing facilities as "very, very cramped." She indicated that the number of patients presently seen on a daily basis fluctuates between fifty and one hundred. The proposed addition would permit the expansion of the physical-therapy and occupational-therapy departments, and, more importantly, would house a swimming pool, which the Center does not currently have even though many of its patients require swimming as a part of their treatment regimen. Ms. Caprio estimated that the enlargement of the facility would increase the Center's daily treatment capacity to 200 patients. The construction plans also include a large off-street parking area within the facility's grounds in order to minimize possible traffic congestion that might thereby result.

This type of planning indicates that in drafting its architectural plans the state was attuned to the concerns of the city and the neighboring community, and demonstrates its good-faith efforts to make reasonable accommodation for local needs. Finally, we deem it significant that the Donley Center is not the only nonresidential facility situated on Blackstone Boulevard; the Butler Hospital complex, only a few doors down the road, has also been providing extensive mental-health treatment services to persons throughout the state for a good many years. Thus, the proposed construction cannot be said to be an unprecedented use within the area. Nor can it be said to constitute the antithesis of sound land use for its specific site or, for that matter, the surrounding community as a whole.

For the foregoing reasons the plaintiffs' appeal is denied and dismissed, the decision of the Building Code Board of Standards and Appeals is affirmed, and the record is remanded to the Superior Court with our

---

sonable access to housing, employment, and educational or recreational opportunities. The official note accompanying § 12–201 emphasizes that the code adopts as a general principle the requirement that a governmental agency seeking to develop land owned or controlled by

another governmental entity is subject to land-use regulation by the controlling government in accordance with the regulatory powers conferred by the code, unless "supralocal" issues are implicated.

opinion certified thereon for entry of final judgment for the defendants.[6]

---

**6.** It is obvious that the parties and the trial justice, in certifying the instant case to this court under § 9–24–25, overlooked our remarks in *Notre Dame Cemetery v. Rhode Island State Labor Relations Board*, 118 R.I. 336, 339, 373 A.2d 1194, 1196 (1977), that an appeal of an administrative action is essentially an appellate proceeding and not a civil action. Previously, in *Bassi v. Zoning Board of Review*, 107 R.I. 702, 705, 271 A.2d 210, 212 (1970), when construing G.L.1956 (1969 Reenactment) § 9–24–1 relating to appeals of a "final judgment, decree or order of the superior court in *any civil action*" (emphasis added), it was noted that nothing in this statute "even remotely suggests that an appeal from a decision of a zoning board to the Superior Court is a *civil action * * *.*" The applicability of the certification procedure invoked by the parties to an appeal from a decision of the Rhode Island Building Code Board of Standards and Appeals is therefore highly questionable. Nevertheless, because of the significant public interest involved, we have proceeded with the case on its merits in spite of the parties' failure to consider this procedural question. Our doing so should in no way be construed as precedent for appealing such administrative decisions in the future.