OPINION OF THE COURT
Bellacosa, J.
Should the expansion, with accessory uses, of the Greater Rochester International Airport by the County of Monroe be subject to the site plan approval requirements of the City of Rochester? Based on General Municipal Law § 350 and on the balancing of public interests, we agree with the result at the Appellate Division that it should not.
The facts before the Appellate Division, pursuant to CPLR 3222 (b) (3), are that the airport is owned and operated by the County and is located substantially in the City. Between 1984 and 1986, the County proposed and approved amendments to its master plan for the airport, including expansion of the main terminal, improvement of the runway apron, and addition of an enclosed parking garage, an air freight facility, a hotel and a temporary parking facility for use during construction of the enclosed parking facility. All improvements were on property located wholly within the City.
The County initially submitted a site plan application to the City in February 1987, for all of the planned improvements except the temporary parking facility, the air freight facility, and the runways. The City requested additional information concerning the improvements and compliance with the State Environmental Quality Review Act. The County responded that the planned uses (with the exception of the hotel, which is not in issue in this case) were governmental and immune from City site plan oversight, and that its prior practice of keeping the City apprised of airport proposals had been only a courtesy, not an acquiescence to City review. The City asserted review jurisdiction based on the proprietary classification test.
*341 The Appellate Division unanimously declared that the "Rochester City Code § 115-30 D (7) and City permit requirements do not apply to the expansion” (131 AD2d 74, 80) based on the traditional governmental versus proprietary categorization. Alternatively, it noted that since "the governmental versus proprietary distinction is of ancient vintage” and "may be unconvincing” (id., at 79), the Rochester ordinances were nonetheless inapplicable because the State enabling legislation, General Municipal Law § 350, impliedly frees the County operation of the airport from City control. While the parties’ arguments concentrate on the governmental-proprietary classification, both acknowledge that the test may have outlived its usefulness.
We conclude that the time has come for retiring this labeling device. In its place, a "balancing of public interests” analytic approach will be substituted. Talismanic application of the old test "beg[s] the critical question of which governmental interest should prevail when there is a conflict between the zoning ordinance of one political unit and the statutory authority of another unit to perform a designated public function” (Note, Governmental Immunity from Local Zoning Ordinances, 84 Harv L Rev 869 [1971]).
The governmental-proprietary function test, as traditionally applied in this State to land use, was borrowed from the field of tort liability as derived from the absolute sovereign immunity doctrine (Nehrbas v Incorporated Vil. of Lloyd Harbor, 2 NY2d 190, 194; compare, County of Westchester v Village of Mamaroneck, 22 AD2d 143, 148-149, affd 16 NY2d 940). Under the old test, a municipality is immune from zoning regulations if the uses qualify as governmental (see, Nehrbas v Incorporated Vil. of Lloyd Harbor, supra [village immune from own zoning ordinance]; Village of Larchmont v Town of Mamaroneck, 239 NY 551 [village immune from town ordinance]; Oswald v Westchester County Park Commn., 234 NYS2d 265, affd 18 AD2d 1139 [county immune from town ordinance]). However, a municipality has been subject to such prescriptions when it acts in a corporate or proprietary capacity (Little Joseph Realty v Town of Babylon, 41 NY2d 738, 742 [operation of asphalt plant]).
The test has surely been on shaky ground for a long time. "Even during its heyday, the distinction between 'governmental’ and 'proprietary’ functions of government was subjected to a 'veritable landslide’ of criticism and was labeled an 'enigma’ *342 and an ’absurdity’ [citations omitted]. The abandonment of the rule of sovereign immunity has virtually destroyed the only real basis for the creation of the distinction” (County of Nassau v South Farmingdale Water Dist., 62 AD2d 380, 387, affd 46 NY2d 794, 796 [in affirming, this court added, "the demarcation between governmental or proprietary interests in property owned or operated by government or its subdivisions no longer is as clear as it was in the past”]).
The Supreme Court itself noted in Garcia v San Antonio Metro. Tr. Auth. (469 US 528, 531), overruling National League of Cities v Usery (426 US 833), that an "attempt to draw the boundaries of state regulatory immunity in terms of 'traditional governmental function’ is not only unworkable but is also inconsistent with established principles of federalism”. The court observed that the governmental function rationale of National League of Cities v Usery (id.) had been construed as providing immunity from regulation in the governmental operation of a municipal airport (Amersbach v City of Cleveland, 598 F2d 1033, 1037-1038 [6th Cir]), but not for the regulation of air transportation (Hughes Air Corp. v Public Utils. Commn., 644 F2d 1334, 1340-1341 [9th Cir]). Consistent with our own court’s observation in Nehrbas v Incorporated Vil. of Lloyd Harbor (2 NY2d 190, 194, supra), the Supreme Court in Garcia (supra) concluded that an organizing principle behind the test’s application was not apparent and, thus, it discarded the governmental-proprietary function label in the field of regulatory immunity under the Commerce Clause.
Contradictions in governmental function designations have even cropped up within traditionally provided municipal services. In O’Brien v Town of Greenburgh (239 App Div 555, affd without opn 266 NY 582), for example, we affirmed an Appellate Division holding that the collection and disposal of garbage was a proprietary function. Twenty-two years later, we distinguished that holding, concluding that disposal of rubbish was a governmental function, and allowed the storage of garbage trucks in a residential area contrary to village zoning restrictions (Nehrbas v Incorporated Vil. of Lloyd Harbor, 2 NY2d 190, 195, n 1, supra). Such contradictions unmask the illusory benefit of the litmus governmental-proprietary distinction (see, Township of Washington v Village of Ridgewood, 26 NJ 578, 584, 141 A2d 308, 311; City of Pittsburgh v Commonwealth of Pennsylvania, 468 Pa 174, 178-179, n 4, 360 A2d 607, 609-610, n 4). ”[T]he reasoned balancing of the competing public and private interests essential to an equitable resolu *343 tion of such conflicts has been forsaken for a mechanical application of convenient labels” (Note, Governmental Immunity from Local Zoning Ordinances, 84 Harv L Rev 869, 872 [1971]; Blackstone Park Improvement Assn. v Rhode Island Bd. of Stds. & Appeals, 448 A2d 1233, 1238 [RI]). One often cited denunciation of the imprecision of the governmental-proprietary function test contends that “no satisfactory basis for solving the problem whether the activity falls into one class or other has been evolved [and] [t]he rules sought to be established are as logical as those governing French irregular verbs” (Seasongood, Municipal Corporations: Objections to the Governmental or Proprietary Test, 22 Va L Rev 910, 938).
The American Law Institute and a great many States have adopted a balancing of public interests approach to resolve such land use disputes (see, 4 Rathkopf, Zoning and Planning, at 53-48, n 17 [4th ed]; Model Land Dev Code §§ 7-301, 7-304, 12-201). This balancing approach subjects the encroaching governmental unit in the first instance, in the absence of an expression of contrary legislative intent, to the zoning requirements of the host governmental unit where the extraterritorial land use would be employed (Rutgers State Univ. v Piluso, 60 NJ 142, 152, 286 A2d 697, 702). Then, among the sundry related factors to bé weighed in the test are: “the nature and scope of the instrumentality seeking immunity, the kind of function or land use involved, the extent of the public interest to be served thereby, the effect local land use regulation would have upon the enterprise concerned and the impact upon legitimate local interests” (id., 60 NJ, at 153, 286 A2d, at 702). In Orange County v City of Apopka (299 So 2d 652, 655 [Fla App]), the catalogue of potential factors to be considered by the reviewing court was expanded to include the applicant’s legislative grant of authority, alternative locations for the facility in less restrictive zoning areas, and alternative methods of providing the needed improvement (see, Lincoln County v Johnson, 257 NW2d 453, 458 [SD]; Blackstone Park Improvement Assn. v Rhode Island Bd. of Stds. & Appeals, 448 A2d 1233 [RI], supra). Another important factor is intergovernmental participation in the project development process and an opportunity to be heard. Realistically, one factor in the calculus could “be more influential than another or may be so significant as to completely overshadow all others”, but no element should be “thought of as ritualistically required or controlling” (Rutgers State Univ. v Piluso, 60 NJ 142, 153, 286 A2d 697, 703, supra).
*344 Dealing first with the legislative intent factor in the instant case, our Legislature did not expressly provide that the operation of the airport should be immune from all land use oversight by the City of Rochester. General Municipal Law § 350 (1) provides, in part, however, "[w]hen the airport or landing field is to be located in whole or in part outside the boundaries of the municipality seeking to establish or construct the facility, the approval of the local legislative body of the city, town or village within which the facility will be located shall be obtained [emphasis added].” Here, the airport is, of course, situated within the County and, also concentrically, within the boundaries of two separate townships and the City. Moreover, General Municipal Law § 350 is a provision dedicated to the establishment and operation “of a city, county, village or town” airport, and the restrictive portion previously quoted, by its terms, does not subject a “county” to the land use provision of lesser municipalities. Thus, the Legislature, by reasonable and natural interpretation of the entire section, exempted the County from the preapproval requirement of the City. Finally, competing land use restrictions and policy choices among these various municipalities could otherwise foil the fulfillment of the greater public purpose of promoting intra- and interstate air commerce.
Equally significant under the new test are these additional public interest factors in this case: the dispute involves a County plan which seeks to expand an existing use; given the existing land use, there is no other practical location for the proposed use; the expansion was subject to County land use oversight approval, including public hearings and a comment period in which the City could have participated; there is no express City oversight authority in the State enabling legislation; no detriment to adjoining landowners, as opposed to competing political interests, is alleged; and the nature of an international municipal airport, serving interstate and intrastate commerce goals, is in both the local and greater public interest.
That a portion of the planned improvements will be leased out for operation does not, in the context of this airport expansion case, affect the result. The Legislature expressly contemplated leases by a county for the operation or use of all or part of the county airport “for aviation purposes and for other purposes required for or necessary to the efficient and successful operation of an airport” (General Municipal Law § 352 [5]).
*345 Some 60 years ago, well before the congested, common air and space age of today, Chief Judge Cardozo presciently captured the public importance of municipal airports in Hesse v Rath (249 NY 436, 438): "A city acts for city purposes when it builds a dock or a bridge or a street or a subway (Sun P. & P. Assn. v. Mayor, 152 N. Y. 257). Its purpose is not different when it builds an airport (City of Wichita v. Clapp, 125 Kans. 100). Aviation is today an established method of transportation. The future, even the near future, will make it still more general. The city that is without the foresight to build the ports for the new traffic may soon be left behind in the race of competition. Chalcedon was called the city of the blind, because its founders rejected the nobler site of Byzantium lying at their feet. The need for vision of the future in the governance of cities has not lessened with the years. The dweller within the gates, even more than the stranger from afar, will pay the price of blindness.”
We thus hold that the expansion of the Monroe County Airport is free of land use oversight from the City of Rochester. The airport terminal, parking facilities, and air freight facility are embraced within the immunity from the requirements of the City’s land use laws because they constitute accessory uses customarily incidental to an airport operation (see, Matter of De Mott v Notey, 3 NY2d 116; Great S. Bay Mar. Corp. v Norton, 58 NYS2d 172, affd 272 App Div 1069).
Accordingly, the order of the Appellate Division should be affirmed, with costs.
Chief Judge Wachtler and Judges Simons, Kaye, Alexander, Titone and Hancock, Jr., concur.
Order affirmed, with costs.