Martha Krisel, Esq. Informal Opinion Village Attorney Village No. 2003-10 of Rockville Centre One College Place Rockville Centre, N.Y. 11570
Dear Ms. Krisel:
You have asked whether a Village of Rockville Centre zoning ordinance prohibiting "[off-track] gambling establishments operated by any governmental agency" in all zoning districts of the village is enforceable. You have also asked whether, if a prohibition on OTB facilities is not valid, any other zoning regulations can be applied to such facilities. For the reasons set forth below, we conclude that a village may not prohibit OTB facilities in all zoning districts, but that such facilities may be subject to some zoning regulations.[1]
Background
OTB facilities outside New York City are operated by regional off-track betting corporations. The corporations are created by the State as public benefit corporations, subject to passage of enabling legislation by participating counties[2]. See Racing, Pari-Mutuel Wagering and Breeding Law § 502. The board of directors for each corporation is appointed by the governing body of those counties within the region that choose to participate. Id. § 502(1). A regional off-track betting corporation is authorized to acquire and use real property in its own name, id. § 503(4), or it may use property acquired by participating counties through purchase, condemnation, or lease. Id. § 505.
OTB facilities where off-track pari-mutuel wagers may be placed on horse races are known as "branch offices." Racing, Pari-Mutuel Wagering and Breeding Law § 501(10). A branch office may be either a simulcast facility, defined as any facility licensed to air live telecasts of horse races for the purpose of pari-mutuel wagering,[3] id. § 1001(a), (j), or a non-simulcast facility. Although nearly all existing OTB branch offices now have simulcast licenses, some branch offices do not.[4]
While most new OTB facilities can be expected to apply for a simulcast license, they are not required to do so.
An OTB corporation may also apply for a license to operate a "simulcast theater," a type of simulcast facility.[5] Racing, Pari-Mutuel Wagering and Breeding Law § 1001(l). Simulcast theaters tend to be bigger, more sophisticated establishments than non-theater simulcast facilities. In addition to providing wagering opportunities, a simulcast theater may include facilities for public entertainment and to provide food and beverages and "any other convenience currently provided at racetracks and not inconsistent with local zoning ordinances." Id.; compare, e.g., id.
§ 520(3) (sale of food and beverages prohibited at OTB facilities); § 1008(4) (sale of food and beverages in simulcast facilities may be authorized by Racing and Wagering Board). Admission to a simulcast theater requires payment of a fee, while admission to a simulcast facility is typically free. Id. § 1009(5); compare, e.g., id. § 532 (winnings at branch office subject to surcharge), § 1008(b) (with permission of Racing and Wagering Board, admission fee may be charged at simulcast facility authorized to sell food and beverage).
Thus, an answer to your questions requires a separate analysis of whether a village may completely prohibit at all locations within its boundaries, or otherwise regulate through zoning, OTB non-simulcast branch offices, OTB simulcast facilities, and OTB simulcast theaters.
Analysis
A. OTB Non-Simulcast Branch Offices
1. Validity of Ordinance Prohibiting Such Facilities
Municipalities are granted broad power to enact local legislation. See
N.Y. Const. art. IX, § 2(c); Mun. Home Rule Law § 10. Such power is not, however, unbounded. One limitation is that a municipality may not enact legislation that is inconsistent with any general law. Id. For municipal home rule purposes, a "general law" is a State statute that by its terms and in its effect applies alike to all counties, all counties other than those wholly-included within a city, all cities, all towns or all villages. Mun. Home Rule Law § 2(5).
We believe that Racing, Pari-Mutuel Wagering and Breeding Law §518 is a "general law" for home rule purposes. It provides that:
 off-track pari-mutuel betting on horse races, conducted under the administration of the state racing and wagering board in the manner and subject to the conditions provided for in this article, shall be lawful, notwithstanding the provisions of any other law, general, special or local . . . it being the purpose of this article to derive from such betting . . . a reasonable revenue for the support of government, and to prevent and curb unlawful bookmaking and illegal wagering on horse races. It is also the intention of this article to ensure that off-track betting is conducted in a manner compatible with the well-being of the horse racing and breeding industries in this state, which industries are and should continue to be major sources of revenue to state and local government and sources of employment for thousands of state residents.
Racing, Pari-Mutuel Wagering and Breeding Law § 518 (emphasis added). By its language and in its effect, it contains no exceptions from its general application. Thus, it applies to all counties, cities, towns, and villages alike.
Because the Legislature has declared that off-track parimutuel wagering on horse races is "lawful, notwithstanding the provisions of any other law, general, special or local," we conclude that a village zoning ordinance prohibiting OTB facilities anywhere in the village — effectively declaring off-track betting to be unlawful within village boundaries — would be inconsistent with a general law of the State, and therefore would be unenforceable with respect to non-simulcast branch offices.
2. Application of Other Zoning Ordinances to Such Facilities
Having concluded that an outright prohibition on OTB facilities is unenforceable with regard to non-simulcast branch offices, we consider the question of whether such facilities are subject to any local zoning regulation. While we cannot dispositively answer this question in the absence of facts outside the scope of this opinion — i.e., the specific provisions of the ordinance and the nature of the local interests that the ordinance was intended to serve — we offer the following general analysis. First, as the Court of Appeals held in McMinn v. Townof Oyster Bay, 66 N.Y.2d 544 (1985),
 [i]n order for a zoning ordinance to be a valid exercise of the police power it must survive a two-part test: (1) it must have been enacted in furtherance of a legitimate governmental purpose, and (2) there must be a "reasonable relation between the end sought to be achieved by the regulation and the means used to achieve that end."
McMinn, 66 N.Y.2d at 549 (citations omitted). The Legislature has established off-track betting as a lawful activity in furtherance of the State's interests in generating revenue, discouraging bookmaking, and supporting the horse racing and breeding industries. See Racing, Pari-Mutuel Wagering and Breeding Law § 518. Local antipathy to the existence of OTB facilities would therefore not appear to be a legitimate local governmental purpose. See, e.g., Matter of Buchwalter v. N.Y.C.Off-Track Betting Corp., 88 Misc.2d 671, 675 (Sup.Ct., Queens Co. 1976) ("Questions involving the propriety of off-track betting have been answered by the Legislature in the affirmative by the creation of the New York City Off-Track Betting Corporation"); Bamonte v. New York CityOff-Track Betting Corp., 80 Misc.2d 980, 983 (Sup.Ct., Queens Co. 1975) ("If petitioners' underlying grievance is the existence of OTB, the remedy lies with the Legislature, not the courts"). Any local land use ordinance regulating OTB non-simulcast facilities would therefore have to be enacted in furtherance of, and rationally related to, some other legitimate interest of the locality and could not be used as a pretext for a complete ban on such facilities.
Second, assuming the village enacted a local zoning or planning regulation of general applicability that fostered traditional land use planning objectives (such as regulation of traffic, noise, or compatibility with neighboring uses), its applicability to OTB non-simulcast facilities would be governed by the balancing of interests test adopted by the Court of Appeals in Matter of County of Monroe,72 N.Y.2d 338 (1988).[6] That analysis begins with consideration of whether there is evidence of legislative intent that a particular governmental land use be subject to or exempt from local zoning. In the absence of such legislative intent, a governmental unit seeking to locate within the boundaries of another governmental unit is deemed, in the first instance, to be subject to local land use regulation. Monroe at 343. Then, numerous factors must be weighed to determine if immunity from the regulation is nonetheless appropriate, including:
 "the nature and scope of the instrumentality seeking immunity, the kind of function or land use involved, the extent of the public interest to be served thereby, the effect local land use regulation would have upon the enterprise concerned and the impact upon legitimate local interests[,]" . . . the applicant's legislative grant of authority, alternative locations for the facility in less restrictive zoning areas, . . . alternative methods of providing the needed improvement . . . [and] intergovernmental participation in the project development process and an opportunity to be heard. Realistically, one factor in the calculus could "be more influential than another or may be so significant as to completely overshadow all others", but no element should be "thought of as ritualistically required or controlling."
Monroe, 72 N.Y.2d at 343 (citations omitted).
Thus, the first question in determining the applicability of a village zoning ordinance to a proposed non-simulcast branch office is whether the legislation relating to non-simulcast branch offices contains evidence regarding the Legislature's intent as to the applicability of local zoning regulation to such facilities. The statutes regulating non-simulcast facilities, and their legislative history, reveal no such evidence of intent. In the absence of such evidence, a local zoning regulation would initially be presumed to apply to an OTB non-simulcast facility, subject to a balancing of the Monroe factors. The outcome of that balancing would, of course, depend upon the particular facts at issue.
B. OTB Simulcast Branch Offices
1. Validity of Ordinance Prohibiting Such Facilities
Pursuant to Racing, Pari-Mutuel Wagering and Breeding Law §1003(2)(f) ("§ 1003(2)(f)"), every applicant for a simulcast license must provide the Racing and Wagering Board with "written confirmation from appropriate local officials that the location of such facility and the number of patrons expected to occupy such facility are in compliance with all applicable local ordinances." In Op. Att'y Gen. No. 94-F4, we considered the application of § 1003(2)(f) to a regional OTB simulcast facility and concluded that the Legislature intended that simulcast facilities "be subject to at least some local regulation." That opinion did not address the question of whether local regulation of the "location" of an OTB simulcast facility may include an outright prohibition. As set forth below, we conclude that § 1003(2)(f) does not empower a municipality to completely ban OTB simulcast facilities within its boundaries.
The Legislature has declared that "the racing, breeding and pari-mutuel wagering industry is an important sector of the agricultural economy of this state, provides substantial revenue for state and local governments, and employs tens of thousands of state residents." Racing, Pari-Mutuel Wagering and Breeding Law § 1000. Based on these significant statewide interests, the Legislature determined that it was in the "best interest of the state" to encourage experimentation with simulcasting under the regulation of the State Racing and Wagering Board. Id. The Legislature has thus identified a statewide goal that is served by the creation of simulcast facilities. To achieve that goal, OTB branch offices must have some opportunity to establish OTB simulcast facilities within municipalities across the State.
The Legislature did grant municipalities a role, albeit a limited one, in the process of authorizing a proposed simulcast facility. While the prospective operator of a simulcast theater must supply a copy of a resolution adopted by the governing body of the municipality approving the application and requesting that the Racing and Wagering Board approve the application, see Racing, Pari-Mutuel Wagering and Breeding Law §1009(3)(e), an applicant for a simulcast facility license must simply provide written confirmation from municipal officials that the location of the proposed facility complies with local zoning regulations. Id. § 1003(2)(f). Thus, in contrast to the statutory requirements for a license to operate a simulcast theater, the Legislature chose not to require that an applicant seeking a license for a simulcast facility secure the consent of the local government. This suggests that while a municipality may prohibit the establishment of a particular simulcast theater by withholding its consent pursuant to section 1009(3)(e), the municipality is not so empowered with respect to non-theater simulcast facilities. Where the Legislature has included a provision in one part of a statute but not another, "[t]he failure . . . to include [the] matter . . . is an indication that its exclusion was intended." Pajak v. Pajak, 56 N.Y.2d 394,397 (1982) (statutory provision for affirmative defenses to divorce on ground of adultery evidence that Legislature's failure to provide for defenses to divorce on ground of cruel and inhuman treatment was intentional and that no such defenses were permissible); Nyack Hospitalv. Village of Nyack Planning Board, 231 A.D.2d 617 (2d Dep't 1996) (statutory provisions in Town and Village Law providing approval-by-default for subdivision approval, but not site plan review, evidence that Legislature did not intend that failure of local planning board to decide application for site plan review within statutory time frame would result in automatic approval). The absence of any consent requirement is particularly persuasive of legislative intent where, as here, the provision including the language in question and the provision not containing it were enacted by the same legislation.[7] See NyackHosp., 231 A.D.2d at 617-18.
Interpreting the statute so as to achieve the stated legislative purpose, we conclude, in light of the State's expressed interest in encouraging experimentation with simulcast facilities, the concomitant limited role of a municipality in the approval of a particular simulcast facility, and the legislative intent that a municipality not have the power to prohibit individual simulcast facilities, that the Legislature did not intend that a local government could entirely prohibit OTB simulcast facilities within its borders.
2. Application of Other Zoning Ordinances to Such Facilities
As discussed supra, an application to operate a simulcast facility must include "a written confirmation from appropriate local officials that the location of such facility . . . [is] in compliance with all applicable local ordinances." Racing, Pari-Mutuel Wagering and Breeding Law §1003(2)(f). We believe that this language authorizes a village to enact an ordinance designating the zoning districts within which simulcast facilities would be a permitted use or otherwise regulating the location of simulcast facilities within the village. Any local regulation of the location of a simulcast facility would have to be reasonably related to a legitimate governmental purpose, McMinn, 66 N.Y.2d at 549, and could not be written so as to effectively prohibit simulcast facilities altogether. Whether a particular local land use ordinance not directly regulating location would be applicable to an OTB simulcast facility would be governed by Monroe and would depend on the specific provisions of the ordinance and the nature of the local interests that the ordinance was intended to serve.
C. OTB Simulcast Theater
1. Validity of Ordinance Prohibiting Such Facilities
While simulcast theaters are a type of simulcast facility, see Racing, Pari-Mutuel Wagering and Breeding Law § 1001(l), they are subject to additional application requirements. See id. § 1009. These requirements indicate that a municipality may not enact a blanket prohibition on OTB simulcast theaters within a village.
Racing, Pari-Mutuel Wagering and Breeding Law § 1009(3)(e) requires that any application for a license to operate a simulcast theater "shall include . . . [a] copy of a resolution adopted by the governing body of the city, town or village in which the proposed simulcast theater is to be located, approving the application and requesting that the application for the proposed simulcasting theater be approved." Thus, the governing body of a village may prohibit the establishment of a particular simulcast theater within its municipal boundaries by withholding the necessary resolution.
This statutory framework suggests that the Legislature intended that a local governing body would make the determination of whether to support the location of a simulcast theater within its boundaries in the context of a specific licensing application. We are of the opinion, therefore, that a village zoning ordinance may not prospectively prohibit all simulcast theaters in all zoning districts within the village. Furthermore, to the extent such an ordinance permanently precluded a local government from deciding whether to consent to establishment of a theater on a case-by-case basis, that would violate the common law rule that a municipal body may not bind its successors in areas relating to governmental matters unless specifically authorized by statute or charter provisions to do so. This is so because
 [e]lected officials must exercise legislative and governmental powers, within their own sound discretion, as the needs require. Ordinarily they may not so exercise their powers as to limit the same discretionary right of their successors to exercise that power and must transmit that power to their successors unimpaired.
Morin v. Foster, 45 N.Y.2d 287, 293 (1978); see also Quigley v. City ofOswego, 71 A.D.2d 795 (4th Dep't 1979) (same regarding city zoning ordinance). The exercise of discretion by the village governing body in support of or in opposition to a particular application for an OTB simulcast theater license is an exercise of a legislative power, and a village board therefore may not usurp the authority of a future village board to exercise that discretionary authority by prospectively prohibiting simulcast theaters in all districts.
2. Application of Other Zoning Ordinances to Such Facilities
Racing, Pari-Mutuel Wagering and Breeding Law § 1009(6) provides that the "size, location and operation of a simulcast theater shall be subject to local zoning ordinances . . . ." Section 1001(l) provides that amenities at simulcast theaters may include "any other convenience currently provided at racetracks and not inconsistent with local zoning ordinances." We believe that these statutory provisions indicate that the Legislature intended that simulcast theaters would be subject to certain zoning regulations, namely zoning ordinances relating to the size, location, and operation of a simulcast theater, as well as those relating to any additional amenities provided. As with simulcast facilities, any local regulation of these areas would have to be reasonably related to a governmental purpose, McMinn, 66 N.Y.2d at 549, and could not be written so as to effectively prohibit simulcast theaters entirely within the village's borders. Whether any zoning regulation not directly relating to one of these areas will apply would be governed by Monroe and would depend on the specific ordinance and the interest to be protected by that regulation.
Conclusion
We conclude that a village may not prohibit OTB simulcast or non-simulcast branch offices in all zoning districts. We further conclude that a village may not prospectively prohibit simulcast theaters in all districts but may withhold its consent to establish a particular simulcast theater pursuant to Racing, Pari-Mutuel Wagering and Breeding Law § 1009. Finally, we believe that the applicability of valid village land use regulations, other than those specifically provided for by statute, to a proposed OTB facility would be governed by the balancing test set forth in Matter of County of Monroe, 72 N.Y.2d 338 (1988).
The Attorney General renders formal opinions only to officers and departments of State government. This perforce is an informal and unofficial expression of the views of this office.
Very truly yours,
KATHRYN SHEINGOLD, Assistant Solicitor General In Charge of Opinions
By: __________________________
EDWARD LINDNER Assistant Solicitor General
[1] Several prior opinions of this office have considered the application of local zoning ordinances to OTB facilities. In 1976 Op. Att'y Gen. (Inf.) 288 and 1979 Op. Att'y Gen. (Inf.) 96, we concluded that a town zoning ordinance was not applicable to facilities owned by a regional off-track betting corporation. Those opinions are not helpful in answering your question because they were based upon the governmental-proprietary function test subsequently repudiated by the Court of Appeals in Matter of County of Monroe, 72 N.Y.2d 338
(1988).
[2] Section 502 of the Racing, Pari-Mutuel Wagering and Breeding Law provides that, in the absence of appropriate enabling legislation by the county and the subsequent filing of a certificate evidencing such legislation with the Secretary of State by December 31, 1975, the corporate existence of the regional off-track betting corporation would terminate. The certificate for the Nassau OTB corporation, the regional off-track betting corporation with geographic jurisdiction over Rockville Centre, was filed on August 26, 1974.
[3] A simulcast facility may be a venue other than an OTB branch office, such as a racetrack. See Racing, Pari-Mutuel Wagering and Breeding Law §§ 1001(a), (j); 1007.
[4] For example, the Nassau OTB corporation operates 13 simulcast branches and one non-simulcast branch. See New York State Racing and Wagering Board, Nassau Regional Off-Track Betting Corporation, at http://www.racing.state.ny.us/racing/nassau.htm.
[5] A simulcast theater may also be owned and operated by a racing association. Id. § 1009(2). The number of licenses available to operate a simulcast theater is limited. See id. § 1009(1), amended by 2003 N.Y. Laws 62, Part F3, § 27 to allow one license to be issued to the OTB corporation of Nassau County.
[6] Each regional OTB corporation is deemed to be "a body corporate and politic constituting a public benefit corporation," Racing, Pari-Mutuel Wagering and Breeding Law § 502(1), and thus is subject to the balancing of interests test. See, e.g., King v. County of Saratoga Industrial Development Agency, 208 A.D.2d 194, 200 (3d Dep't 1995) (applying Monroe test to Industrial Development Agency, a "body corporate and politic," General Municipal Law § 890-h, constituting a "public benefit corporation," General Municipal Law §856).
[7] Article X, including section 1003(2)(f) and section 1009(3)(e), was enacted by Act of July 12, 1984, ch. 363, § 14, 1984 McKinney's N.Y. Laws 678, 684-692.