Matter of Corrini v Village of Scarsdale (2003 NY Slip Op 51553(U))

[*1]

Matter of Corrini v Village of Scarsdale

2003 NY Slip Op 51553(U)

Decided on December 23, 2003

Supreme Court, Westchester County,

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

This opinion is uncorrected and will not be published in the printed Official Reports.

Decided on December 23, 2003

Supreme Court, Westchester County,
In the MATTER OF CHRISTOPHER CORRINI AND DINA CORRINI, Petitioners, - -
against
VILLAGE OF SCARSDALE, DAVID KROENLEIN, Mayor, TOM CUSICK, NOREEN FISHER, JAMES O'CONNOR, CARL H. PFORZHEIMER III, PETER STRAUSS and JOSEPH A. ZOCK, Trustees, together constituting the VILLAGE BOARD of the VILLAGE OF SCARSDALE, Respondents.
Index No. 03-02361

Wilson, Elser, Moskowitz, Edelman & Dicker LLP
Attorneys for Petitioners
3 Gannett Drive
White Plains, New York 10604
Attn: Steven M. Silverberg, Esq.
Wayne D. Esannason, Esq.
Attorney for Village Respondents
Village of Scarsdale
Office of the Village Attorney
1001 Post Road
Scarsdale, NY 10583

Mary H. SMITH, J.,
This is a CPLR Article 78 proceeding in which petitioners Christopher Corrini and Dina Corrini, husband and wife (hereinafter "Petitioners"), seek a judgment pursuant to CPLR Article 78 reversing, annulling and setting aside two resolutions adopted on October 22, 2002 by respondents The Village of Scarsdale (the "Village"), David Kroenlein, Mayor, Tom Cusick, Noreen Fisher, James O'Connor, Carl H. Pforzheimer III, Peter Strauss and Joseph A. Zock, Trustees, together constituting the Village Board of the Village of Scarsdale (hereinafter collectively the "Village Respondents"). These resolutions involve the Village Respondents' decision to lease currently vacant, undeveloped property (approximately 25,000 square feet), located at 5 Weaver Street in a single family residence zone (hereinafter "the property") but abutting a commercial zone, to the Scarsdale Volunteer Ambulance Corps. ("SVAC") for its use [*2]to construct a new ambulance facility once it has raised the necessary funds.[FN1] The resolutions: (1) authorized the entering into of a proposed lease between the Village and SVAC; and (2) issued a Negative Declaration under the State Environmental Quality Review Act ("SEQRA") with regard to the proposed lease. Petitioners seek to have the resolutions set aside on the ground that there was an inadequate SEQRA review in connection with their adoption. Petitioners also seek to set aside the lease on the grounds that: (1) the lease violates the Village's zoning code (Verified Petition at ¶¶ 38-43); (2) the lease violates the public trust that has been imposed on the property because its use violates the purpose for which the property was acquired (Verified Petition at ¶¶ 44-48); and (3) the lease further violates the public trust that has been imposed on the property because its use may be diverted to a private purpose which is contrary to that public trust. (Verified Petition at ¶¶ 49-54).
In a Decision & Order dated July 11, 2003, this Court denied the Village Respondents' motion to dismiss the petition, but granted SVAC's motion to dismiss the petition without prejudice to any further proceedings wherein SVAC was named as a necessary party. Based on record of the proceedings held before the Village Respondents, as well as the papers submitted in support of, and in opposition to, the petition, this proceeding is decided as follows: 
FACTUAL BACKGROUND
For many years, the Village Respondents and SVAC have entered into a number of operating agreements, the latest being the Operating Agreement dated January 22, 2002 and amended October 8, 2002, which obligates SVAC to provide pre-hospital emergency ambulance services to "all persons within the geographic boundaries of the Village of Scarsdale." (Amended Return, Ex. 6 at 1). The Operating Agreement was entered into pursuant to General Municipal Law § 122-b. That statute authorizes municipalities to independently contract for ambulance services. However, a necessary prerequisite to such an operating agreement is that the ambulance service obtain a voluntary ambulance service statement of registration pursuant to Public Health Law Article 30 (§§ 3000-3016), which in turn requires a showing of public need for the service. (Public Health Law at § 3005(6)).
Indeed, there has been an ever-increasing demand for such services within the Village as the Village Respondents acknowledged when they authorized the leasing of a second ambulance vehicle: "[T]he demographics of the Village of Scarsdale have changed creating an ever increasing burden on SVAC to provide 24-hour per day ambulatory service to residents, teens, the elderly and at community events and sporting events." (Resolution dated October 8, 2002, Amended Return, Ex. 6).
SVAC has been leasing its current ambulance facility from the Village since December 1970. (Resolution dated January 22, 2002, Amended Return, Ex. 6). Given the current ambulance facility's age, the Village Respondents determined that it "will continue to require increasing investment of funds for maintenance and capital improvements ... [and is] deemed [*3]inadequate to provide for the rigorous demands of modern 24-hour per day ambulatory service." (Resolution dated October 22, 2002, Verified Petition, Ex. C). To address this issue, the Village Respondents reviewed various options, including the reconstruction of a new facility on the current site versus the construction of a new facility on other Village-owned property. At the public hearing on October 22, 2002, Trustee Strauss explained that the choice to lease the property to SVAC was not hasty, and "balanced all important considerations." (Amended Return, Ex. 13 at 320). Nevertheless, the issue in this proceeding is not whether the Village Respondents' decision to choose this Village property (as opposed to others) was sufficiently deliberated, but rather, whether the Village Respondents followed SEQRA's procedural and substantive requirements prior to adopting the negative declaration resolution and the resolution which authorized the Village's entering into of the lease.
The SVAC lease is for a term of 99 years, with an annual rent of $10.00. The property is located within 100 yards of SVAC's current facility on Weaver Street, but the new facility would no longer be located at the traffic light at the Heathcote Five Corners' intersection. It is undisputed that at its current location, SVAC "can control traffic signals at the intersection to stop all traffic and to allow ambulances to enter and leave." (Affidavit of Dina Corrini, sworn to February 13, 2003, "Corrini Aff." at ¶ 5). It is also undisputed that Weaver Street is a fairly congested street from a traffic perspective.[FN3] In addition, the current facility is located in a commercial zone whereas the leased property is located in a single-family residence zone abutting that same commercial zone with retail stores adjacent to the property and directly opposite from it. ((Affirmation of Wayne Esannason, Esq. dated 8/21/03 "Esannason Aff." at ¶ 30). Based on a color photo attached to the Corrini Aff., Petitioners' house abuts the property to the rear. It also appears that there are other residential properties facing Heathcote Road that will be impacted by the new facility.
The resolutions at issue were adopted during a public meeting of the Village Respondents on October 22, 2002 (the "meeting"). Prior to the meeting, the Village Respondents had their Environmental Review Officer fill out a Short Environmental Assessment Form ("EAF"), which determined that the action of leasing the property to SVAC for a new ambulance facility would [*4]have no significant environmental effects. During the meeting's public comment session, Petitioner Dina Corrini spoke, as did her attorney and another adjoining property owner, Mr. John McKenna. Mr. McKenna advised the Board that the property at issue was originally his property and that it had been taken by eminent domain to widen the street and bury utility lines. Mr. McKenna "stated that the property should be preserved as open space, and added his concerns about traffic impacts." (Amended Return, Ex. 13 at 315). Mrs. Corrini "expressed her concerns about ... the change in zoning ... that the future neighbors should have been involved in the process ... [and] she requested that a study be done concerning traffic impacts." (Id.). After the public comment session, the Village Board adopted the resolution at issue which declared the Village Board to be lead agency for purposes of SEQRA review, resolved that the lease was an unlisted action pursuant to 6 NYCRR Part 617.2(ak) and, therefore, did not require coordinated review, and further determined "that the action will not have a significant adverse impact on the environment based on information contained in the [Environmental Assessment Form (the "EAF")]." (Verified Petition, Ex. B).
After the adoption of the negative declaration, Trustee Strauss weighed in by stating that "[w]herever construction of the facility would occur, objections would be raised by residents" and that "the residents should be assured that their [major] concerns [regarding noise and screening] will be heard and considerations will be made." (Amended Return, Ex. 13 at 320). He further explained that the traffic concerns were overstated because "SVAC has been in that area and is currently part of the traffic pattern. A move of 100 yards will not change that." (Id.). The Village's Manager also explained that "the Planning Board will review the application for the new facility, will declare itself as the Lead Agency and will determine the level of SEQR analysis to be done in connection with its review and approval." (Id.).
Because the Village Respondents' written negative declaration determination was based entirely on the answers set forth in the EAF, a brief review of the EAF is in order. Part I of the EAF describes the action that was being taken (i.e., the lease of the property to SVAC for a new ambulance facility), and states: (1) that the proposed action will comply with the existing zoning restrictions; (2) that the property is located in the vicinity of residential and commercial uses; and (3) that there were approvals that had to be obtained from New York State Department of Transportation (curb cuts), and from the Village's Planning Board (site plan approval) and Board of Architectural Review. (Verified Petition, Ex. E).
Part II of the EAF the environmental assessment section states that the action would not exceed any Type I threshold and that the action would not receive coordinated review. The remainder of the form has questions designed to elicit whether the action may result in any significant adverse environmental effect. There, the Village's Environmental Review Officer answers, "No" with no further elaboration in response to the questions concerning whether the action could result in any adverse effect to "[e]xisting ... noise levels ... [or] traffic patterns," whether the action could impact the "community or neighborhood character," and whether the action could result in a "change in use of land." (Verified Petition, Ex. E).
 SEQRA COMPLIANCE
Petitioners argue that the Village Respondents issued a negative declaration without considering the following detrimental environmental impacts that would occur as a result of this project:
[*5]"(i) traffic - caused by both the ambulances entering and existing as well as the use of the garage, parking lot, offices and meeting rooms, at various times of the day and night; (ii) noise resulting from the increase in activity, the ambulances themselves, people and vehicles arriving and leaving all hours of the day and night; and (iii) lights from both the ambulances and the automobiles disturbing neighbors."
(Memorandum of Law in Support of Petition at 4; see also Verified Petition at ¶¶ 16-19, 23-24). Petitioners assert that "[w]hen the issue of potential impacts was raised before the Board, the Board members indicated that consideration of such issues would be deferred to another time when a formal site plan application is made." (Verified Petition at ¶ 25). The Village Respondents do not deny these facts, and instead, in their answer deny knowledge or information sufficient to form a belief as to their truth. (Verified Answer at ¶ 3).
By contrast, the Village Respondents argue that even though no project plan was formulated [FN4], the Village Board complied with SEQRA by taking the requisite "'hard look' at the cumulative impact of the lease." (Esannason Aff. at ¶ 17). Pointing to the October 22, 2003 Village Board Minutes and the affidavit of Trustee Peter Strauss [FN5], it is argued that the Village Board reviewed and considered the impacts of traffic and visual aesthetics.
The standard to be applied to an agency's SEQRA determination has been stated as follows:

"It is well settled that judicial review of the SEQRA process is limited to whether "'a determination was made in violation of lawful procedure, was affected by an error of law or was arbitrary and capricious or an abuse of discretion' * * * [I]t is not the role of the [*6]courts to weigh the desirability of any action or choose among alternatives, but to assure that the agency itself has satisfied SEQRA, procedurally and substantively" ... '[n]othing in the law requires an agency to reach a particular result on any issue, or permits the courts to second-guess the agency's choice, which can be annulled only if arbitrary, capricious or unsupported by substantial evidence.'"
(Matter of City of Rye v. Korff, 249 AD2d 470, 471-472, app. denied, 92 NY2d 808; quoting Matter of Jackson v. New York State Urban Dev. Corp., 67 NY2d 400, 416-417). Thus, this issue for this Court is whether the agency "identified the relevant areas of environmental concern, took a 'hard look' at them, and made a 'reasoned elaboration' of the basis for its determination." (Matter of Jackson, 67 NY2d at 416). "Where an agency fails to take the requisite hard look and make a 'reasoned elaboration', or its determination is affected by an error of law, or its decision was not rational, or is arbitrary and capricious or not supported by substantial evidence [FN6], the agency's determination may be annulled." (Matter of WEOK Broadcasting Corp. v. Planning Bd. of the Town of Lloyd, 79 NY2d 373, 383).[FN7]
[*7]
Courts, however, must refrain from substituting their view for the administrative agency's judgment when it rendered the determination which is being reviewed. (Matter of Jackson v. New York State Urban Dev. Corp, 67 NY2d 400; Matter of Citizens Accord, Inc. v. Town Board of the Town of Rochester, 192 AD2d 985, 987, app. denied, 82 NY2d 656). Moreover, simply because the Town Board answered all the questions posed by the EAF in the negative and did so quickly and at a single meeting does not establish that its review was inadequate as a matter of law. (Matter of Gernatt Asphalt Prods., Inc. v. Town of Sardinia, 87 NY2d 668, 689). "[T]he degree of detail included in a negative declaration will 'obviously vary with the nature of the proposal'...." (Matter of Farrington Close Condominium Bd. of Mgrs. v. Incorporated Village of Southampton, 205 AD2d 623, 626 quoting Matter of Har Enters. v. Town of Brookhaven, 74 NY2d 524, 530; Matter of Cannon v. Murphy, 196 AD2d 498, 501).
Pursuant to SEQRA's rules, the lead agency (the Village Respondents) must determine the significance of any unlisted action by undertaking the following steps
"(1) consider the action as defined in sections 617.2(b) and 617.3(g) of this Part;

(2) review the EAF [Environmental Assessment Form], the criteria contained in subdivision (c) of this section and any other supporting information to identify the relevant areas of environmental concern; (3) thoroughly analyze the identified relevant areas of environmental concern to determine if the action may have a significant adverse impact on the environment; and (4) set forth its determination of significance in a written form containing a reasoned elaboration and providing reference to any support documentation."
(6 NYCRR 617.7(b)(1)-(4)). Thus, in making determinations of significance, reviewing agencies must look at impacts which may be reasonably expected to result from the proposed action and compare them against an illustrative list of criteria provided in 6 NYCRR 617.7(c). This list contains "indicators of significant effects on the environment", a few of which are relevant to the Village Respondents' action e.g., actions which result in: (1) a substantial adverse change in existing traffic or noise levels (6 NYCRR 617.7(c)(1)(i)); (2) the impairment of the character or quality of existing community or neighborhood character (6 NYCRR 617.7(c)(1)(v); and (3) a substantial change in the use, or intensity of use, of land (6 NYCRR 617.7(c)(1)(viii)).[FN8]
[*8]
Obviously, the most blatant violations occur where there is no basis in the record for the reviewing court to find that the agency issued a negative declaration prior to taking action (i.e., that the agency properly considered the potential environmental impacts and found that there would be no potential for any significant adverse environmental effect as a result of the action). (See Matter of Di Veronica v. Arsenault, 124 AD2d 442). Furthermore, "compliance with SEQRA must occur before the agency acts; after-the-fact compliance is of no avail." (Di Veronica, 124 AD2d at 444).
As noted in the Court's decision dated July 11, 2003, the action implicated in this proceeding (i.e., the decision to lease the property to SVAC to build an ambulance facility) is an unlisted action. Therefore, the Village Respondents were required to determine the environmental significance and the need for the preparation of an Environmental Impact Statement in accordance with the criteria listed in 6 NYCRR 617.7(c). To assist them in that determination, the Village Respondents had their Environmental Review Officer prepare a short-form Environmental Assessment Form (EAF), required for an unlisted action pursuant to section 617.6. Based on a review of that document, there was no elaboration provided other than a terse "No" in response to the questions designed to determine the potential for significant environmental effects. However, because the change in use of the property from undeveloped, open space to a state-of-the-art ambulance facility (albeit a small facility from an operational standpoint) has the potential to affect noise, visual aesthetics (lights), traffic patterns and the community or neighborhood character (even if those effects may not prove to be significant), the responses provided on the EAF were misleading and failed to provide an adequate basis for the Board's adoption of a negative declaration in this case. (See Matter of Niagra Mohawk Power Corp. v. Green Island Power Authority, 265 AD2d 711, app. dismissed, 94 NY2d 891; Matter of Segal v. Town of Thompson, 182 AD2d 1043). As such, the EAF was insufficient because "[a] properly completed EAF must contain enough information to describe the proposed action, its location, its purpose and its potential impacts on the environment." (6 NYCRR 617.2(m)).
In addition to the deficient EAF, the Court further finds that in their rush to approve the lease, the Village Respondents addressed the resident's concerns over traffic, lights and noise that were raised at the meeting by stating that those concerns would be addressed at future reviews (one or more involving independent SEQRA determinations) by one or more agencies. The Village Respondents did not consider the potential noise and lights impacts vis a vis the adjoining residential property owners prior to adopting the negative declaration [FN9] and gave only a [*9]cursory review to the potential traffic impacts. At present, the current facility is located some 100 yards away from the residences in question and therefore, the noise and lights generated from the facility at its current location (with only commercial properties adjacent to it) do not necessarily impact those neighbors to the same extent as the noise and lights will impact those residences should the new facility be built on the property which adjoins their residences. Furthermore, instead of performing a traffic analysis, the Village Board simply applied their knowledge of the area and decided that because the proposed facility was located within 100 yards of the existing facility and because there would not be any increase in SVAC's operation (i.e., number of ambulances), there would be no increase in traffic. This analysis is flawed. First, it fails to consider the potential use of the facility by the Village Respondents and the other community or civic groups and the traffic that may be generated from those uses, however small. Second, the current facility is located on a busy street, but at the Heathcote Five Corners' intersection where the traffic light can be used to control the ambulance's ingress and egress. The new facility is not located at that traffic light so there would be a change in traffic operation, which could detrimentally impact traffic on Weaver Street. Finally, the Village Respondents failed to analyze the change in the use of the property from open space to an ambulance facility and how that change could impact the character of the neighborhood since the area is zoned for single family residences (though government uses are permitted). Based on the foregoing, the EAF, the minutes of the Village Board meeting and the resolution adopting the negative declaration are devoid of any "reasoned elaboration" concerning why there would be no significant negative environmental effect as a result of this action. Therefore, there is no "adequate basis upon which a reviewing court can ascertain" how the Village Respondents reached their declaration of negative significance conclusion. (Matter of New York City Coalition to End Lead Poisoning, Inc. v. Vallone, 100 NY2d 337, 350). Indeed, 6 NYCRR 617.7[b][3],[4] requires a reasoned elaboration so a reviewing court may determine how the agency came to its conclusion of non-significance. Obviously such a terse written analysis runs afoul of the Second Department's view that "[b]y circulating the reasons for its environmental decision, the lead agency gives an outward sign that environment values and consequences have been considered. But when a lead agency fails to make the required findings, neither the public nor a reviewing court knows what factors were considered, and they cannot be satisfied that the required hard look has been taken." (Glen Head - Glenwood Landing Civic Council v. The Town of Oyster Bay, 88 AD2d 484, 491).
This case is similar in many respects to other Article 78 proceedings in which negative declarations were annulled for their failure to satisfy SEQRA's requirements. For example, Matter of Board of Cooperative Educational Services of Albany-Schoharie-Schnectady-Saratoga Counties v. Town of Colonie, 268 AD2d 838, involved a condemnation proceeding to obtain a curbcut and use of petitioner's access road, which were required as the result of the respondent-Planning Board's site plan approval of an office building running the entire length of [*10]petitioner's access road. Petitioner's Article 78 petition asserted, among other things, that Respondent's determination authorizing the acquisition by condemnation failed to comply with SEQRA. Thus, petitioner argued that "respondent issued its negative determination without addressing petitioner's concerns that the increased use of its access road would create traffic problems and increase the threat of harm to petitioner's students." (Town of Colonie, 268 AD2d at 839). The Third Department agreed holding:

"In its negative determination, respondent failed to identify or address petitioner's concerns even though those concerns arguably involve factors of significant environmental impact, instead baldly asserting that 'the general effect of the proposed project on the environment * * * is minimal * * * [and] will not result in any significant adverse environmental impacts.' Since the proposed taking will have some impact on the environment (see, e.g., 6 NYCRR 617.7[c][1][v],[viii]), respondent's failure to identify relevant concerns and elaborate on the reasons for its conclusions that those concerns were not significant requires rejection of the determination and findings .... Respondent's present contention that it took a hard look at petitioner's concerns is belied by the fact that neither the concerns nor the suggestions to overcome those concerns were incorporated in the negative determination as required by 6 NYCRR 617.7(b)(4)."
(Town of Colonie, 268 AD2d at 840; citations omitted).
Matter of Iorio v. The Town of Mount Pleasant, 131 Misc2d 395 involved the Town Board's issuance of a negative declaration in connection with condemnation proceedings that had been initiated to obtain land for the purpose of widening Kensico Road. The Court found that even if the agency properly classified the action as an unlisted action, the determination of non-significance was made by the Town Board in an arbitrary and capricious manner and was not based upon substantial evidence. The Court found that the agency had failed to take the requisite "hard look" prior to the declaration of non-significance because "the record demonstrate[d] that the environmental concerns of the Kensico Road project in toto were given short shrift by the Town in their last minute rush for approval." (Matter of Iorio, 131 Misc2d at 403). Notably, the Court explained the reason for why it was so important to take the environment into consideration as early as possible. In that case, as here, the court cautioned that "[i]f such determination 'is not prepared at an early stage' * * * later governmental decisions may be influenced by prior governmental decisions or commitments.'" (Matter of Iorio, 131 Misc2d at 398). The court further explained that "'the initiatory action by the Town Board might well have been practically determinative. In effect, the purpose of SEQRA is to assure the preparation and availability of an Environmental Impact Statement at the time any significant authorization is granted for a specific proposal.'" (Id.; emphasis in original; quoting Matter of Sun Beach Real Estate Dev. Corp. v. Anderson, 98 AD2d 367; Matter of Tri-County Taxpayers Assoc., Inc. v. Town Bd. of the Town of Queensbury, 55 NY2d 41, 46-47).
Finally, a case somewhat analogous [FN10] to the instant proceeding is the case of Matter of [*11]Coppola v. Good Samaritan Hospital, Sup Ct, Suffolk County, October 22, 2002, Whelan, J., Index. No. 01-10881. In that case, property owners adjacent to a hospital that was proposing the construction of a new emergency room brought an Article 78 proceeding to annul the Town of Islip's Planning Board's negative declaration concerning the construction of that facility. In that case, the Good Samaritan Hospital sought to relocate its emergency room from the north-westerly portion of the complex (where the ER was originally located) to the south-easterly portion of the property.
In Good Samaritan, unlike this case, the Planning Board failed to adopt a negative declaration prior to approving the site plan. In that case, as here, the Town of Islip had referred the preparation of the EAF to the assistant site plan reviewer, but the reviewer had not completed the environmental review until March 7, 2000 three months after the Planning Board had granted site plan approval. At that time, the reviewer found no significant environmental effects and in so finding, specifically noted "that she was relying upon 'site plan review to mitigate any impacts regarding change to existing traffic patterns.'" The EAF also noted in an inconsistent fashion that the "'intensity & use remain the same or increase.'" In addition, it was clear that the Planning Board in its approval letter had recognized the potential for environmental impacts since it reserved the right "to hold a public hearing to address any future noise and/or loitering complaints and to consider any mitigation necessary to alleviate any problems resulting from the relocation of the Emergency Room facility."
In Good Samaritan, the court held that the Town failed to satisfy the SEQRA's requirements of identifying the relevant areas of environmental concern, taking a hard look at them and making a reasoned elaboration for its determination of non-significance:

"The analysis undertaken on March 7, 2000 by the assistant site plan reviewer for the Town of Islip, which deferred consideration of the one obvious environmental impact, that is, traffic, to 'site plan review to mitigate any impacts regarding change to existing traffic patterns,' and which analysis occurred three months after the Planning Board had already approved the site plan application at an unnoticed meeting, without public comment, underscores the superficiality of the challenged SEQRA process. In addition, the Planning Board's approval, which deferred consideration of the one obvious environmental impact, that is, traffic, to some future public hearing to 'consider any mitigation necessary to alleviate any problems resulting from the relocation of the Emergency Room facility,' despite the fact that the Planning Board acknowledged that it had to 'be very careful, because there are residents as you mentioned over there,' reveals a complete misunderstanding of the SEQRA process. Instead of the mandatory 'hard look,' the Planning Board and the Town, at best, offered a 'confused gaze' at the potential traffic implications of the relocation of the Emergency Room. While acknowledging a traffic and noise concern at the prior location and that the relocation of the emergency room away from the west side of the property 'will make these residents very happy,' the Planning Board and the Town failed to adequately address the impact to the residents on the east side of the property. The concern is not sufficiently detailed in the EAF, particularly in light of the unexplored comment that the potential for change in use [*12]or intensity of use of land will 'remain the same or increase.' It is not for this Court to weigh the desirability of having the Emergency Room relocated to the east side of the Hospital property, but only to insure that the Town and Planning Board satisfied the procedural and substantive requirements of SEQRA and the rules and regulations implementing it .... Here, procedurally, the Planning Board violated 6 NYCRR 617.3(a) .... [because it had] approved the site plan submitted to it just seven days earlier, without first considering and approving a resolution concerning SEQRA compliance. If the Planning Board seeks to rely upon the [EAF] completed by the Town's reviewer, such was not accomplished until March 7, 2000, three months after approval of the site plan."
(Matter of Coppola v. Good Samaritan Hospital, Sup Ct, Suffolk County, October 22, 2002, Whelan, J., Index. No. 01-10881, at 6-7; emphasis added).
The Court further noted that with regard to the Planning Board's compliance with the substantive requirements of SEQRA - "that is, the Town reviewer's determination of non-significance":

"Based upon the current record, the Court cannot find that the Town adequately considered the probable environmental impact of the emergency room relocation and reasonably addressed all prevailing concerns. The [EAF] is internally inconsistent and fails to contain sufficient evidence to provide a rational basis to support a determination that the requisite 'hard look' was undertaken. That is not to say that a determination of non-significance is not possible. While the record does contain evidence of the traffic and noise concerns of the original neighbors on the west side of the Hospital and generalized objections to the relocation from a traffic consultant submitted with the original petition and from a safety expert (see Return, p.30), Beach Drive is, apparently, a widely utilized roadway. The record fails to disclose how the addition of ambulances, hospital workers, walk-in patients, and visitors to that site will affect conditions, if at all. The record is also devoid of objective reports of a significant impact (compare Matter of Munash, __ AD2d ___, supra). Once the Town corrects the procedural errors, it may still be able to articulate a rational basis to support a determination of non-significance."
(Id. at 7).
Accordingly, the Court annulled the site plan approval and remitted the matter to the Planning Board and the Town for further de novo consideration and rehearing in accordance with the court's order.
The decision was affirmed by the Appellate Division, Second Department. In affirming the inadequacy of the SEQRA review, the Second Department held that "[o]ne of the relevant areas of environmental concern was the impact the project would have on traffic in the area. The record demonstrates that the negative declaration was made without a hard look having been [*13]taken at the traffic issue." (Matter of Coppola v. Good Samaritan Hospital, 309 AD2d 862).[FN11]
In this case, there is no procedural failure since the negative declaration was adopted prior to the Village Respondents' resolution which authorized the lease of the property. However, the comments regarding the substantive defects in the SEQRA review are equally applicable to this case. The Court finds that the Village Respondents failed to perform an adequate SEQRA review because in rendering their negative declaration, they left the traffic impact analysis to future review by DOT (and potentially the Planning Board) and left the analysis regarding noise and lights to future review by the Planning Board.[FN12] Thus, it would appear that much like the Town reviewer in Good Samaritan, the Village Respondents deferred the potential significant environmental effects (as well as any mitigation measures such as screening to reduce such impacts) to other agencies' determinations. Moreover, similar to the court's finding in Good Samaritan, there was a failure to comply with SEQRA insofar as there was no hard look performed or a reasoned elaboration provided in the Village Respondents' determination of non-significance. Thus, as in Good Samaritan, the answers in the EAF do not provide a "rational basis to support a determination that the requisite 'hard look' was undertaken." Indeed, the answers provided in the EAF in this case were in many (if not all) respects factually inaccurate and misleading. And the negative declaration was based entirely on that faulty EAF, thereby rendering the SEQRA analysis patently inadequate. (Matter of Kravetz v. Plenge, 102 Misc2d 622, 631 [court found a failure to take a hard look based on, inter alia, "[t]he negative declaration declares that the neighborhood character will not be changed based upon a conclusory statement made by the respondents [who prepared the EAF] ..., without any supporting data or studies"]; The City of New Rochelle v. The Town of Mamaroneck, 2001 WL 1665463 at 5 ["the short form EAF ... was a paradigm of non-information"]; Ginsberg Development Corp. v. Town Board of the Town of Cortlandt, 150 Misc2d 24 [court annulled negative declaration regarding "steep slopes" zoning amendment for failure to consider economic impacts; while respondent's return annexed hundreds of pages of information that respondent contended it considered in extensive work sessions, no minutes of those meetings were kept and respondent could not use that shortcoming to its advantage because its decision did not provide a reasoned elaboration with reference to such supporting documentation]).
[*14]
An ambulance facility is necessary to protect the health and welfare of the Village's residents and guests. There will likely be opposition to wherever the new facility is constructed. By finding that the Village Respondent's failed to fulfill SEQRA's substantive requirements and requiring that a de novo review occur, the Court is not suggesting that the use of a short Environmental Assessment Form is insufficient as a matter of law and that there must be an Environmental Impact Statement prepared. Nor is the Court suggesting that there must be a significant environmental effect as a result of the lease. The Court is merely finding that a more in depth analysis must be undertaken to ensure that the Village Respondents adequately identify the potential effects (such as traffic, noise, lights, and community character) and sufficiently analyze the amount of impact associated with such effects by classifying them as minor, moderate or significant (including any measures that could be undertaken to mitigate such impacts) prior to rendering a negative declaration determination. In addition, the final determination must provide a sufficiently detailed and reasoned elaboration such that a reviewing court may discern how the agency came to its negative declaration conclusion.
Thus, the Court finds that the analyses regarding the impacts of environmental effects such as traffic, screening and noise were left for future review by other agencies and the environmental analysis undertaken as evidenced by the EAF was too superficial to pass SEQRA muster. Accordingly, the Village Respondents' resolutions authorizing the entering into of the lease and adopting the negative declaration are hereby annulled because the Village Respondents failed to sufficiently identify the relevant areas of environmental concern, take a hard look at them, and provide a reasoned elaboration of the basis for their determination. (Matter of Tri-County Taxpayers Assn., Inc. v. Town Bd. of the Town of Queensbury, 55 NY2d 41). The matter is remanded to the Village Respondents for a de novo environmental review. The Court leaves it up to the Village Respondents to determine what steps are necessary to comply with SEQRA. (Matter of Williamsville Southeast Amherst Homeowners Assn., Inc. v. Sharpe, 110 AD2d 1074).
THE LEASE COMPLIES WITH THE ZONING CODE AND THE PUBLIC TRUST
IMPOSED AS A RESULT OF THE EMINENT DOMAIN PROCEEDINGS
While there is somewhat conflicting evidence concerning the circumstances under which the property was purchased (i.e., whether it was condemned or purchased pursuant to a voluntary arms-length transaction), the Court will presume for the purposes of its decision that the facts are that the Village started a condemnation proceeding against the property on July 19, 1966, which resulted in an Order issued by The Honorable John J. Dillon, Supreme Court Justice, on November 28, 1966, finding the Village entitled to a judgment condemning the property. (Verified Petition, Ex. A). Therefore, the purchase pursuant to a deed likely occurred as a means of settling the underlying eminent domain proceeding and it is assumed for the purposes of this decision that a public trust has been imposed on the property.[FN13] Accordingly, the property may [*15]only be used in accordance with the purposes for which it was acquired i.e., "for highway, off-street parking, and other public purposes." (See New York Mail and Newspaper Transportation Co. v. Shea, 30 AD 266; quoting Railroad Co. V. Williamson, 91 NY2d 552 and In re City of Buffalo, 68 NY 167 ["'The general principle that land once taken and appropriated as a public use, pursuant to law, under the right of eminent domain, cannot, under general laws and without special authority from the legislature, be appropriated to a different public use is well established'"]; Johnson v. Town of Brookhaven, 230 AD2d 774; quoting Port Chester Yacht Club v. Village of Port Chester, 123 AD2d 852, 853 ["Absent legislative sanction, the validity of a lease by a municipality of park land and other property entrusted for public use turns on the nature of the use rather than the nature of the user. Leases of such lands to private organizations have been found valid so long as the land is to be used for or the lease serves a public purpose ...."]).
The lease of the property is for a period of 99 years at a rent of $10 a year, but is conditioned on the continuation of the Operating Agreement with SVAC since it provides that "[i]f the Operating Agreement is terminated or expires and is not renewed within 120 days of its expiration, then the property and all its appurtenances shall vest with the Landlord without recourse." (Amended Return, Ex. 2 at 1.1). Thus, there is a condition subsequent on the leases' 99 year term such that if the Operating Agreement with the Village terminates or expires, the property and the facility revert to the Village. (See The City of New York v. The Coney Island Fire Department, 259 AD 286, aff'd, 285 NY 535).
The facility will contain administrative offices, garage bays and meeting room(s), sleeping quarters and other facilities that SVAC deems appropriate and in conformance with the Operating Agreement. The lease is very clear that the sole use to which SVAC may put to the property is that of an ambulance facility (Amended Return, Ex. 2 at Preamble and 2.1) and it states that "[n]otwithstanding anything to the contrary contained in this Lease, Tenant shall not permit or suffer the Premises (or any part thereof) to be used or occupied, for any use or purpose other than the uses described in the first sentence of this Section 2.1(a), by any person or entity ...." (Amended Return, Ex. 2 at 2.1). The lease further prohibits SVAC from assigning or subletting any part of the premises or "allow[ing] the same to be used or occupied by others ...." (Amended Return, Ex. 2 at 10.1)
Despite the very explicit provisions limiting the property's use to that of an ambulance facility, Petitioners nevertheless assert that the public trust has been violated because the property is not being put to the specific purpose for which it was acquired street widening. Alternatively, Petitioners claim that the because the lease permits the use of meeting rooms by various groups, the use is being partially diverted to a private use and therefore violates the public trust that has been placed on the property as a result of the eminent domain proceedings. The basis for this claim is the lease provision which provides:

"Landlord and Tenant agree and acknowledge that in the event Landlord desires to use a meeting room or conference room within the Premises ... to conduct a meeting by Landlord or any organization designated by Landlord; Tenant may at Landlord's reasonable request make a meeting room available to Landlord at no cost. However, Tenant shall reserve the right to charge a reasonable fee for use of the meeting room(s) as well as impose reasonable requirements as Tenant deems appropriate for civic [*16]organizations and community groups from the Village of Scarsdale interested in using a meeting room."
(Amended Return, Ex. 2 at 2.2).
It cannot seriously be disputed that an ambulance facility serves a public purpose and nowhere in the petition is it suggested that the ambulance facility furthers a private purpose. "Public use is a term which is broadly defined to encompass any use which contributes to the health, safety, general welfare, convenience or prosperity of a community ...." (Centerport Bird Sanctuary, Inc. v. Town of Huntington, 125 AD2d 521, 521-522, app. denied, 69 NY2d 611). Thus, "[p]rivate property taken for the purposes which promote or protect the public health is taken for a 'public use.'" (McQuillin, Municipal Corporations, § 32.49, at 481 (3d ed)). Accordingly, because an ambulance facility is a public use, the lease complies with one of the stated purposes for which the property was condemned "other public purposes" and there has been no violation of any public trust that may have been imposed on the property. Petitioners' third cause of action is without merit.[FN14]
Petitioners' fourth cause of action which asserts that the Village violated the public trust because the meeting rooms may be used by the Village or by civic or other community organizations and therefore, the property is improperly being partially diverted to a private use, is similarly unavailing. These uses are also public uses that do not contravene any public trust that may have been imposed on the property. Thus, based on the lease's provisions,[FN15] the Village [*17]Respondents' admissions found in the Answer (i.e., that the meeting room could be used by civic organizations when not utilized by SVAC), and the intent expressed by Trustee Strauss at the Village Board meeting on 10/22/02 [FN16] (i.e., that the use of the facility was exclusively that of an ambulance facility except to the extent that the Village, or other community or civic groups at SVAC's discretion could use the meeting rooms), the only other use would be a sporadic use of the meeting room(s) by the Village or other civic or community groups at SVAC's discretion. This use does not contravene any public trust that may have been imposed on the property. (See Curran v. City of New York, 191 Misc 229, aff'd, 275 AD 784; J.B. Realty Enter. Corp. v. City of Saratoga Springs, 270 AD2d 771, app. denied, 95 NY2d 758). In Curran, a taxpayer sought a judgment declaring invalid, inter alia, a license permitting "the temporary use by the United Nations of the New York City Building in Flushing Meadow Park as a meeting place for the General Assembly ...." (Curran, 191 Misc2d at 230). The Court dismissed the action on the grounds that "[w]hile it be true, generally, that land dedicated as a park is inalienable without legislative fiat, it seems to this Court that the temporary use for such obvious public purpose would be permissible under the law as enunciated in all of the leading cases on the subject." (Id. at 234; citations omitted). Because there is no legal distinction between the alienation restrictions imposed on parks and the restrictions imposed on other properties impressed with public trusts through condemnation, the Court's holding in Curran has equal force to this case. Accordingly, Petitioners' fourth cause of action is not sustainable.
In Petitioners' second cause of action, Petitioners claim that "'[t]he proposed use including, but not limited to, meeting rooms, which are available to various groups to use, offices and a parking lot is inconsistent with and not permitted under the Village's applicable zoning laws." (Verified Petition at ¶ 40). Therefore, "[t]he determination to issue a negative declaration and enter into a Proposed Lease for a use, which is not permitted violates applicable law." (Verified Petition at ¶ 43). This assertion is baseless. The property is located in a Residence A zone and pursuant to the Village's Zoning Code, a government use is a permitted use. (See Amended Return, Ex. 14). As set forth above, the ambulance facility is a government/public use and the Village is expressly permitted to contract for such services. Even if an ambulance facility weren't a permitted use, it would appear that under the balance of interests test adopted in Matter of County of Monroe, 72 NY2d 338 [FN17] the ambulance facility is a greater public interest as [*18]opposed to proprietary and should be exempt from the Village's zoning ordinance. (See Westhab, Inc. v. Village of Elmsford, 151 Misc2d 1071). Accordingly, Petitioners' claim that the proposed use violates the local zoning laws is without merit. (See Miller v. Incorporated Village of East Hills, 41 Misc2d 525; Hewlett v. Town of Hempstead, 3 Misc2d 945, aff'd, 1 AD2d 954, app. denied, 1 NY2d 643).
Based on the foregoing, it is hereby
ORDERED, that the petition is granted to the extent that the resolutions (1) approving the Village's entering into the lease, and (2) adopting a negative declaration finding that the action will not have a significant adverse impact on the environment, are annulled for their failure to follow the substantive requirements of SEQRA, and it further
ORDERED, that the matter is remanded to the Village Board for further de novo consideration and rehearing in accordance with this Decision, Order and Judgment.
 December 23, 2003 Honorable Mary H. Smith, J.S.C.
Decision Date: December 23, 2003
Footnotes

Footnote 1:SVAC requested that the Village Respondents authorize the lease ahead of having fully developed plans because the lease would assist SVAC in its fund-raising campaign, the purpose of which is to raise the $1.5 million dollars needed for the construction of the new ambulance facility. SVAC has already received an anonymous donation of $750,000. (See Amended Return 13 at 315). 

Footnote 3:While the Village Respondents "denied knowledge or information sufficient to form a belief" (Verified Answer at ¶ 3) in response to Petitioners' claim that the property "is located on a busy street near the Scarsdale five corners, one of the busiest intersections in the Village" (Verified Petition at ¶ 7), the Court finds sufficient evidence to establish that Weaver Street is a fairly busy street based on (1) the photograph attached to the Corrini Aff. showing a backup of traffic along Weaver Street, (2) Mrs. Corrini's averment that "[t]he 'five corners' is an extremely busy intersection at which traffic backs up during a large part of the day and evening" (Corrini Aff. at ¶ 4), (3) the statement made by John McKenna, the original owner of the property in question at the Village Board Meeting on 10/22/02 wherein Mr. McKenna stated that the reason for the Village's condemnation proceeding against his property was to widen the road and bury utility lines (presumably to address traffic concerns) (Return 13 at 315) and (4) the fact that Westchester County has commissioned a traffic study concerning Weaver Street and the Five Corners' intersection "to collect traffic data and provide alternatives for possible improvements." (Amended Return, Ex. 13 at 313).

Footnote 4:The Village Respondents cannot be heard to argue that it was impossible to analyze the potential impacts due to the lack of a project plan. The Village Respondents knew the use that was going to be put to the property and knew approximately how large the facility would be to accommodate all the needs that were not being accommodated in the current facility. In addition, the Village Respondents knew that the access to the facility would no longer be at a traffic light, but instead, in the middle of a busy street. The Village Respondents could have easily undertaken a worst case scenario approach in analyzing the potential environmental effects of a project-less proposal. (See Matter of Neville v. Koch, 79 NY2d 416).

Footnote 5:The Court's review of the Village Board's administrative decision is limited to the record made before the agency. (See Matter of Montalbano v. Silva, 204 AD2d 457; Matter of Kelly v. Safir, 96 NY2d 32). In determining "whether the agency's decision was arbitrary and capricious, the court cannot take proof or consider facts which were not brought before the administrative agency." (See Matter of Welch v. New York State Division of Housing and Community Renewal, 287 AD2d 725, 726; see also Matter of Dearborn Assoc. v. Environmental Control Board, 144 AD2d 556). In this regard, the Court did not consider the Affidavit of Elizabeth Marrinan, the Village's Environmental Review Officer, nor the Affidavit of Peter Strauss because they were not part of the administrative record forming the basis for the administrative determinations being challenged in this Article 78 proceeding. (See Matter of Basile v. Albany College of Pharmacy of Union University, 279 AD2d 770, app. denied, 96 NY2d 708).

Footnote 6:The Court of Appeals in Matter of WEOK Broadcasting Corp. defined substantial evidence as being "'such relevant proof as a reasonable mind may accept as adequate to support a conclusion or ultimate fact" or "'the kind of evidence on which reasonable persons are accustomed to rely in serious affairs.'" (Matter of WEOK Broadcasting Corp., 79 NY2d at 383; quoting 300 Gramatan Avenue Assocs. v. State Div. Of Human Rights, 45 NY2d 176, 180 and People ex rel. Vega v. Smith, 66 NY2d 130, 139).

Footnote 7:In that case petitioner had provided empirical data showing that there would be no visual impact to neighboring properties as a result of the project in question. The neighbors rebutted this data with generalized objections to the effect that a neighboring property would necessarily be visually impacted by the project. The Court reversed the agency's finding of a significant environmental effect holding:

"Respondent's finding that there may be a visual impact from the FDR homestead is unsupported by any factual data, scientific authority or any explanatory information such as would constitute substantial evidence. Thus, respondent's conclusory finding that there would be an unacceptable negative aesthetic impact ... cannot be deemed 'reasoned elaboration' of its determination .... Although a particular kind or quantum of 'expert' evidence is not necessary in every case to support an agency's SEQRA determination, here, the record contains no factual evidence, expert or otherwise, to counter the extensive factual evidence submitted by petitioner. To permit SEQRA determinations to be based on no more than generalized, speculative comments and opinions of local residents and other agencies, would authorize agencies conducting SEQRA reviews to exercise unbridled discretion in making their determinations and would not fulfill SEQRA's mandate that a balance be struck between social and economic goals and concerns about the environment ...."
(Matter of WEOK Broadcasting Corp., 79 NY2d at 384-385; emphasis in original). Here, the Village Respondents did not present any data to support their conclusion that there would be no traffic impact from the change in location of the ambulance facility. Of course, there was also no data presented by the opposing residents.

Footnote 8:While Petitioners argue that this action would result in the encouraging or attracting of a large number of people to a place or places for more than a few days, compared to the number of people who would come to such a place absent the action (6 NYCRR 617.7(c)(1)(ix)), and therefore, the Village Respondents should have considered this effect prior to making its negative declaration, there is no evidence that the facility would result in the attraction of a large number of people to the facility, and accordingly, it would appear that the Village Respondents were not negligent in failing to take this indicator into consideration.

Footnote 9:The Village Respondents contend that based on Trustee Strauss's affidavit, the Village Respondents considered the visual impact of the proposed facility because "prior to approving the lease, the Village Board instructed SVAC that it must provide adequate screening to minimize the visual impact for the immediate neighbors and must install a sidewalk along Weaver Street to improve pedestrian safety." (Esannason Aff. at ¶ 19). Trustee Strauss's affidavit was not a part of the Village Respondents' record and cannot provide a basis for a finding that noise and visual impacts were sufficiently considered and mitigated prior to the negative declaration's adoption. Instead, the record supports a finding that these issues were raised by the neighbors, but that the Village Respondents deferred the resolution of these issues to the site plan review process. (Amended Return, Ex. 13 at 320).

Footnote 10:There is an albeit slight similarity between an emergency room facility and an ambulance facility since the emergency room facility in that case had the greater potential to detrimentally impact (40-50 ambulance trips a day) the environment as compared to the ambulance facility found in this case, which supposedly receives on average 3 calls a day. 

Footnote 11:Given the Second Department's holding in Good Samaritan, and given the factual dissimilarity in the case relied on by the Village Respondents, Matter of Terrace Manor Civic Association v. Town of North Hempstead, 301 AD2d 534, wherein the Appellate Division, Second Department held that it was proper for respondents to defer the merits of a traffic improvement plan (i.e., an additional access point) for the reconfiguration of an existing shopping center to the site plan review process, the Court finds that the deferral of the traffic analysis was per se improper in this proceeding. 

Footnote 12:Thus, there is evidence in the minutes from the 10/22/02 meeting that "[w]hen the issue of potential impacts were raised before the Board, the Board members indicated that consideration of such issues would be deferred to another time when a formal site plan application is made." (Verified Petition at ¶ 25). In addition, the Village Respondents' prior submissions on their motion to dismiss were replete with admissions to this effect. 

Footnote 13:At the public hearing before the Village Board on 10/22/02, Mr. John McKenna, the prior owner of the property stated that the property was taken by eminent domain to widen the street and bury utility lines, neither of which was ever done. (See Amended Return, Ex. 13 at 315).

Footnote 14:Petitioners rely on three inapposite cases in support of their claim that the property is improperly being diverted to a private use. In all of the cases, a municipality had leased land that had been impressed with a public trust to a private entity for that entity's private (for profit) purposes. For example, Matter of Lake George Steamboat Co. v. Blais, 30 NY2d 48, and People ex rel. Swan v. Doxsee, 136 AD 400 involved municipalities' leases of public dock facilities on land that had been impressed with public trusts to private entities for the entities' private purposes. Furthermore, in Kenny v. Board of Trustees of the Incorporated Village of Garden City, 289 AD2d 534, app. denied, 98 NY2d 607, the Second Department Court affirmed the lower court's grant of a permanent injunction against the respondent's leasing of property to a company for a privately-operated assisted living facility unless and until such a lease was approved by the legislature. In that case, the land in question had been acquired by condemnation for public and recreational uses and therefore, in that case, unlike here, the lease "was inconsistent with the public purposes for which the property was acquired." 

Footnote 15:There are two different versions of the lease, one annexed to the petition which uses broad language concerning who could use the meeting room (i.e., "all other interested in using a meeting room") as compared to the language found in the version annexed to the 10/22/02 resolution which uses the more narrow language (i.e., "civic organizations and community groups from the Village of Scarsdale interested in using a meeting room"). The Court has used the latter version since there is no evidence in the record to suggest that the version annexed to the petition was the one that was approved by the Village Respondents in their 10/22/02 resolution. 

Footnote 16:At that meeting, Trustee Strauss stated that "it is not the intention of SVAC to open this facility to any community use. The facility may be made available at their discretion to other organizations." (Amended Return, Ex. 13 at 320). 

Footnote 17:The factors to weigh in this analysis are "'the nature and scope of the instrumentality seeking immunity, the kind of function or land use involved, the extent of the public interest to be served thereby, the effect local land use regulation would have upon the enterprise concerned and the impact upon legitimate local interests'" as well as "the applicant's legislative grant of authority, alternative locations for the facility in less restrictive zoning areas, and alternative methods of providing the needed improvement ... [and] intergovernmental participation in the project development process and an opportunity to be heard." (Matter of County of Monroe's Compliance with Certain Zoning and Permit Requirements of the City of Rochester, 72 NY2d 338, 343).