OPINION OF THE COURT
Erin P. Gall, J.
Introduction
The controversy before this court concerns the construction of a new county jail in Herkimer County. For the last 15 years, the County of Herkimer and the Village of Herkimer have sparred over where to build this facility. The Village of Herkimer does not want the facility built within the Village limits and has taken steps to amend its zoning law to block such construction. The County of Herkimer argues that the former P&C site, which is located in the Village, is the best location for the facility and that the County’s need to site the new jail trumps the Village’s grounds for zoning out correctional facilities.
This case, which was initially filed in December of 2011, started as a hybrid proceeding—a declaratory judgment action under article 30 of the CPLR and a petition under article 78 of the CPLR. Herkimer County (hereinafter referred to as the County) sought to set aside the Village of Herkimer’s (hereinafter referred to as the Village) denial of sewer services among other things (under article 78), and an order declaring that the Village must provide sewer services for the proposed site (under article 30). The action was later amended to seek additional relief, including a further action for declaratory judgment, e.g., an order declaring any local law that would exclude correctional facilities from locating within the Village to be null and void.
On August 22, 2012, this court ruled, to wit, that under the state preemption doctrine, the amendment of February 6, 2012 to the Village of Herkimer’s Zoning Ordinance and any local ordinance that resulted in the exclusion of correctional facilities and jails from the state-approved location was null and void. This court also ruled that the remaining issues would be held in abeyance while the County submitted an application for sewer services as required under Village Law.
The Village subsequently appealed to the Appellate Division, Fourth Department. On September 27, 2013, the Appellate Division issued a memorandum and order in Matter of County of Herkimer v Village of Herkimer (109 AD3d 1166 [4th Dept *518 2013]). The Appellate Division modified and affirmed the judgment rendered by this court on August 23, 2012, and ruled that the zoning ordinance was not null and void under the preemption doctrine. However, the Appellate Division held that the County may be immune from the amendment to the zoning law nevertheless. The Appellate Division held that the record before the Court was inadequate to permit the appropriate balancing of public interests necessary to determine whether the County is immune from the requirements of the zoning law. The Appellate Division remitted the case to this court for a determination, “based upon a more complete record, whether the County is immune from the requirements of the Village zoning ordinance” (id. at 1168). The Appellate Division stated, in part:
“The factors to be weighed in making that determination are ‘the nature and scope of the instrumentality seeking immunity, the kind of function or land use involved, the extent of the public interest to be served thereby, the effect local land use regulation would have upon the enterprise concerned and the impact upon legitimate local interests [,] . . . the applicant’s legislative grant of authority, alternative locations for the facility in less restrictive zoning areas, . . . alternative methods of providing the needed improvement [,] . . . intergovernmental participation in the project development process and an opportunity to be heard.’ ” (Matter of County of Herkimer v Village of Herkimer, 109 AD3d 1166, 1167-1168 [4th Dept 2013], citing Matter of County of Monroe [City of Rochester], 72 NY2d 338, 343 [1988].)
The Appellate Division has charged this court with the task of declaring the rights of the parties, to wit, is the County immune from the requirements of the Village Zoning Ordinance? After the parties’ completion of discovery, the court held a trial commencing on July 20, 2015, and ending on July 27, 2015, for the purpose of establishing a factual record from which the court could perform a balancing of public interests as required under Matter of County of Monroe (City of Rochester) (72 NY2d 338, 343 [1988]).
The court heard the testimony of several witnesses and received documentary evidence during the trial. Counsel for both the petitioner and the respondent have submitted post-trial memoranda which has been also considered by this court.
*519 Facts
Every county in New York State is under a statutory obligation to maintain a county jail. (See County Law § 217.) The county jail serves an important governmental function in protecting the safety of its residents and in providing safe and secure housing for inmates. The New York State Commission of Correction is the state agency responsible for overseeing the operation of all correctional facilities in New York State. (See County Law § 216.) The Commission is charged with the authority of approving all new sites for correctional facilities as well as inspecting existing facilities for compliance with health and safety regulations. (See County Law § 216; Correction Law §§ 500-c [4]; 45.)
The Herkimer County Jail (hereinafter referred to as HCJ) has been located within the Village of Herkimer since approximately 1834. In the late 1970s, the County received federal funding to construct a new facility which has remained in operation to date. The jail is located within the Village limits, next to the Herkimer County Courthouse and County Office Building.
County Administrator James Wallace testified that in the late 1990s/early 2000s, the Commission began to tighten the regulation of boarding of inmates at HCJ. HCJ became faced with serious overcrowding issues. Under Commission guidelines, HCJ was permitted to house a maximum of 41 inmates at the jail. Given the increases in jail population since the 1970s, HCJ was required to board inmates at outside correctional facilities on a regular basis in order to comply with these regulations. Currently, HCJ boards out an average of 30 to 50 inmates per day to outside facilities.
Testimony at trial established that in 2000, the annual cost of “boarding out” was approximately $100,000. By the year 2015, the costs of boarding out had increased to over $1.6 million per year. In addition to the direct costs of boarding inmates, the County incurs additional expenses in transporting inmates to outside facilities and accessing legal and mental health services at outside facilities. Herkimer County, unlike some other counties, does not have a “road crew,” so it was required to purchase vehicles and employ additional staff to transport inmates to and from outside facilities. The County must reimburse host facilities for the cost of any mental health services and assigned counsel services for inmates while boarded at outside facilities. The County Administrator testi *520 tied that these transportation costs alone exceeded $120,000 annually as of 2014.
In late 1999/early 2000, the County Administrator, HCJ Captain, and County Sheriff elected to attend a training program at the National Institute of Corrections in Colorado to learn about necessary considerations in the design and construction of correctional facilities. Thereafter, in February of 2000, the Herkimer County Legislature resolved to create an advisory committee to evaluate the needs of the County to determine if it would be necessary to build a new jail and to study all phases of the jail siting and building process. The committee included the County Administrator, Jim Wallace, the Herkimer County Sheriff, the Captain of HCJ and several County legislators.
Between 2000 and 2005, the relationship between the Commission and the County became more strained. The Commission would visit HCJ on a weekly basis to inspect the jail and operations. At this time, the Commission began cutting back on the number of inmates that could be housed at HCJ and required HCJ to board out an increased number of inmates.
During this period, the County made efforts to reduce the jail population by initiating an ankle bracelet program, which permitted the early release of certain prisoners under supervision. Mr. Wallace and Sheriff Farber indicated at trial that this program was very successful, and did reduce the population by more than 100 inmates, but it was insufficient to address all of the concerns with the existing jail.
In order to further evaluate the overcrowding issues, the County engaged LaBella Associates (an engineering and architectural firm specializing in the siting and construction of correctional facilities, hereinafter referred to as LaBella) to conduct a population study to determine what size jail would be adequate to meet the County’s future needs. Two other firms were also engaged. Based upon the information provided in the sizing studies, the County concluded that it would be necessary to construct a 130-bed facility with room for further expansion.
In 2006, the Commission informed the County that, due to substantial lack of compliance with the Commission’s building requirements, HCJ must close its inmate housing unit and be used only as a holding area for no more than four inmates. The Commission cited a number of serious structural issues at HCJ, including but not limited to: overcrowding, poor air quality, inadequate recreational area, and a defective roof. The Com *521 mission directed the County to repair the existing facility to make it useable in the short term and to present a plan for the construction of a new permanent facility.
Since issuing this directive in 2006, the Commission has remained closely involved with the County’s efforts in operating the existing facility and in proceeding with the plan to build a new facility. Sheriff Christopher Farber indicated that he is in daily contact with members of the Commission regarding the boarding out of inmates. Further, the Commission has kept close tabs on the renovations to the existing facility and in the new jail siting process. The County has been permitted to continue operating the existing facility by seeking multiple variances from the Commission’s regulations. The County has indicated that HCJ is operating at the mercy of the Commission and will be forced to shut down if the Commission elects to revoke or fails to renew the variances under which HCJ is currently operating. County Administrator Wallace suggested that should the County fail to make progress in the siting and construction of the new facility, the Commission will likely close HCJ and require the remaining inmates at the facility to be boarded out.
Testimony at trial established that the County currently expends approximately $1.7 million per year to house inmates at various correctional facilities outside Herkimer County, including Oneida, Madison, Montgomery, Otsego and other counties. This does not include the ancillary costs incurred for transportation to board inmates at outside facilities, costs for transporting inmates boarded at outside facilities to and from various court appearances, additional staffing, and reimbursement for probation costs, public defenders and other inmate services. County Administrator Wallace testified at trial that should HCJ be shut down, these costs would necessarily increase as the number of inmates boarded out would double (the daily boarding costs alone would likely increase from $1.7 million to $4 million per year).
The County presented evidence at trial that it has considered various alternatives to the construction of a new facility. The County considered renovating and expanding the existing jail for long-term usage, constructing a smaller facility instead of a 130-bed facility, housing inmates outside the County on a permanent basis and constructing a joint correctional facility with Oneida County. The Commission rejected the proposed expansion of the current jail and also rejected the possibility of *522 building a smaller facility to accommodate less than 130 beds. Housing inmates outside the County on a permanent basis was also rejected by the Commission as each county is required to maintain a county jail under state law. The cost of operating a joint facility was found to be prohibitive (it would cost $2 million more per year than operating independently) and Oneida County was unwilling to provide housing to Herkimer County inmates on a permanent basis.
Testimony at trial established that the County began considering locations for a new facility in the early 2000s. At this time, the County was also considering relocating its highway garage. To accommodate both of these needs, the County began searching for a lot of approximately 25 to 27 acres to site both the proposed jail and a highway garage. The County thereafter abandoned the concept of colocating these facilities and moved forward with searching for a new site for HCJ. Testimony established that a location for a county jail must have certain essential characteristics: 10 to 15 useable acres of flat land, availability of municipal water and sewer services, and close proximity to the busiest courts.
County Administrator Jim Wallace testified that the County sent out letters to municipalities in Herkimer County looking for site possibilities in addition to articles in the newspaper requesting information on potential sites. Mr. Wallace testified that the County did a tertiary review of approximately 40 to 50 locations and submitted approximately 14 of those sites to LaBella for further consideration.
Mark Kukuvka, project coordinator with LaBella, testified that his firm was engaged to perform the earlier sizing studies for the County and also to assist in the review and study of potential sites for the new facility. LaBella also assisted in the review of proposed jail design concepts. Testimony at trial indicated that the County did an exhaustive search for a new site prior to settling on the P&C site. The County made efforts to locate the facility outside of the Village, due to the fact that the Village already had a significant percentage of tax exempt property, but was limited by access to sewer and water services at sites within close proximity to the courts.
Testimony at trial established that the biggest obstacle in siting the proposed facility has been securing access to municipal sewer and water services, and in particular, water. In most communities, these services would be provided through the creation of a water and sewer district. The creation of a *523 new water and sewer district would need to be approved by the host municipality and is highly discretionary. The host village or Village of Herkimer would then need to agree to extend its services to the site. In many (most) cases involving the siting of HC J, the proposed host municipality indicated an unwillingness to form a water and sewer district for this purpose. The County could not legally force an unwilling host town to provide water and sewer services to the proposed facility. Prior to trial, the Village of Herkimer had refused to extend its services to any adjacent municipality (although there was testimony at trial from current Mayor Anthony Brindisi that the Village would now agree to do so in certain circumstances). Mr. Wallace testified that this difficulty resulted in the County concluding that it had no choice but to locate the facility within the Village of Herkimer where it believed that services could not be denied as water and sewer districts already exist.
The County narrowed its consideration to 14 sites after its tertiary review of 40 to 50 sites. This more acute examination generally included soil testing, archaeological studies and environmental reviews. The County obtained appraisals and entered into purchase agreements for several of these locations before they were eventually eliminated from consideration. The following provides a summary of the 14 sites:
1. Quarry Site (located on Rte. 5S, Town of Herkimer/German Platts)
The County presented evidence that the Town of German Flatts opposed the creation of a water and sewer extension for this site. In addition, there was significant opposition from a residential community (Manion Heights) near the quarry. Further, the landowner was opposed to selling the property and literally cried on the County Legislator’s shoulder when he visited the site.
2. Shells Bush Road (located off of Rte. 28, Town of Herkimer)
The County entered into an agreement to purchase the land at this site. It would have required the creation of a water and sewer district by the Town of Herkimer and provision of services by the Village of Herkimer. The County presented evidence, however, that the site had potential environmental and archaeological issues as it was located in a designated flood plain which was also the site of a former Indian village. The purchase agreement was ultimately rejected by the Herkimer County Legislature after a special session for public consideration of this site.
*524 3. Pumpkin Patch (Rte. 5S, South Business Park, Town of Frankfort)
The County found this site to be desirable because of the availability of municipal power and ease of access to the courts, but the Herkimer County Industrial Development Agency considered it to be a prime economic development location and the property was zoned to exclude government buildings. Testimony at trial indicated that development was pending and that a new tenant would soon be building on the site.
4. Altrex/Junkyard (Town of Herkimer)
This site is an existing junkyard. The County established that it was eliminated from consideration because of contamination in addition to the difficult topography of the land which included hills and ravines. There was also no indication from the Town that it would be willing to create a sewer district to extend sewer and water services to this site.
5. Burrill (Rte. 28/Town of Herkimer)
The County was very interested in this site and entered into a purchase agreement with the landowner. The County proceeded with investigation of archaeological resources, environmental review, water and sewer development costs, and an appraisal, but was unable to move forward with the site after the Village Board denied the County’s request for water and sewer services.
6. McKennan Road/Herkimer County Community College (Town of Herkimer)
This location was initially desirable because of the possibility of utilizing college water and sewer services, however, the college was concerned about traffic to and from the jail running through campus as there was only one entrance/exit. In order to divert traffic it would be necessary to build a new road. This presented problems as the topography included a tremendous ravine which would require the County to build a bridge for the new road at an estimated cost of around $1.7 million.
7. Putts Hill (Town of German Flatts)
The County presented evidence that this site was eliminated from consideration because the Town of German Flatts had no interest in creating a water and sewer district, in addition to opposition from Manion Heights residents and potential flood plain issues.
8. Ilion Duofold (Village of Ilion)
This site was initially considered because of a letter received from the landowner, however, the County found the site to be *525 contaminated and unsuitable because of topographical issues (very narrow strip of land and would require the removal of several houses which would result in substantial demolition costs).
9. Schuyler Business Park (Town of Schuyler)
The County received a letter from the Town of Schuyler Supervisor expressing interest in hosting the new HCJ. However, the site was problematic as it had no water and sewer services available and would need to tie into Oneida County’s sewer system. Oneida County is operating under a consent decree which limits its ability to add new customers to its system. In addition, one of the businesses in the park threatened to leave if the jail moved in, taking with it over 70 jobs. Finally, the business park is located over nine miles from the courts which would result in significant increase in transportation and staffing costs. As the result of these factors, the County Legislature voted against siting at this location. The Village, however, presented evidence that there is continued interest in pursuing construction at this site and that this site is more desirable because the Town was in favor of the facility.
10. Eastern Herkimer County Industries (Town of Little Falls)
The County established that this site was eliminated from consideration because the land is rocky and presented design challenges, rendering the installation of water and sewer, though available, cost prohibitive. Further, it is not located within close proximity to the busiest courts.
11. Little Falls Farm (Town of Little Falls)
The County presented evidence that the Little Falls Farm site, like the Eastern Herkimer County Industries site, was rocky, too far from the busiest courts and would require substantial cost to bring in sewer and water.
12. Manheim Business Park (Town of Manheim)
The County established that this site was quickly eliminated from consideration because of its lengthy distance from the courts.
13. Route 28 (Village of Herkimer)
The County offered testimony that this site was not pursued because the size and shape of the property made it unsuitable for a correctional facility.
14. P&C (Village of Herkimer)
The County presented testimony that the P&C site was considered early on in the siting process but wasn’t seriously *526 evaluated because of its location within the Village. The County appreciated the Village’s concerns with taking another large parcel off of the Village tax rolls. However, the site became more attractive as the County encountered difficulty accessing water and sewer services at other locations and even more desirable after the landowner razed the previously existing shopping center structure. Richard Grossman, the landowner, testified that the building had become an eyesore after P&C left over 12 years ago. Mr. Grossman testified that he demolished the shopping center structure and the property is now vacant land. In addition, the site is located less than one mile from the Herkimer County Courthouse and near the Village and Town of Herkimer courts. As the site is located within the Village, sewer and water services are available. Connecting to the existing sewer would require upgrades but the County was willing to bear these costs. The site is located in an area with mixed commercial and residential use.
Mark Kukuvka testified that the site is a good location as it is flat, and previously disturbed. Mr. Kukuvka indicated that renditions of the future site show the proposed jail building to be situated between the dam and a hillside, so that it is naturally partially sheltered from view with the housing units oriented toward the hillside.
Thus, the site was ultimately selected because it was in close proximity to the county courthouse, is accessible from a main road and would allow for reuse of a site that has remained vacant for many years. The site is also located in an area with mixed commercial and industrial use with screening from residential uses (allowing the facility to not impact the community fabric) and has accessibility to infrastructure for municipal water and sewer that is already in place.
The County presented evidence that the northwest corner of the site contained some residual contamination from a former gas station which has been remediated by the County at a cost of approximately $240,000. The County presented evidence that it has completed the necessary studies, as well as environmental review pursuant to the State Environmental Quality Review Act (SEQRA) for the site, has received approval from the Commission to build the site, has designed the facility, and has commenced the bidding process for the cell packages. County Administrator Wallace testified that given the 15 years of evaluating sites, this litigation, and significant expense, the P&C site is the only viable option to satisfy the Commission’s mandate.
*527 Mr. Wallace also testified that Herkimer County initiated a .25% sales tax increase in 2007 for the purpose of raising revenue for the new jail. This money is available and earmarked for this project. It is anticipated that the new jail will cost $34 million to build and it will take 9.5 years for the County to repay the bond for the project. Mr. Wallace indicated that once the bond is paid, it is anticipated that the County will save up to $2 million per year in costs related to operation of the new facility.
Mr. Wallace also testified, and documentation was received, that during the 14-plus-year siting process, there were between 38 to 40 meetings open to the public where the public was able to comment on the siting of the facility, including a formal presentation given to the public in October of 2014 when the County reviewed a summary of the jail siting process and provided the Village and public an opportunity to voice their concerns. Residents were able to speak out in opposition to the location of the jail. Village witnesses did not dispute access to information or public meetings regarding the siting of the facility.
In support of its position to uphold its Zoning Ordinance, the Village testified to five findings which would fall under the “legitimate local interests” factor under Monroe in support of its amendment to the zoning law. The first finding provides that “a jail in the village would change the character of the village and detract from the commercial, residential and industrial vibrancy of the village.” Several Village residents testified as to their concerns in having the jail located near residences. These individuals were concerned that it would bring their property values down and were fearful of potential breakouts. Mark Anesworth, former Mayor for the Village of Herkimer for 15 years, testified that at least half of the landowners in the Village are against locating the jail within the Village. Mr. Anesworth testified that those opposed to the jail were generally concerned about the types of people that the jail would necessarily attract to the community and also believed that building the jail at this location would decrease their property values.
In response to the general opposition of residents, the County presented evidence that the current jail has been located in the Village since 1834, rendering it a long-standing part of the Village’s community and character. The current jail is also located near residences, as are a number of other sites that were under *528 consideration by the County. The County also presented evidence that the proposed facility will be designed to look like a library or office building and that it will be partly sheltered from view because of the natural boundary created by the dam.
The second finding provides that “taking a large parcel in the village for a jail would violate the Village’s Strategic Economic Development Plan. The Village has a finite amount of land, and very little room for commercial and industrial development.” Mr. Anesworth testified that the Village of Herkimer is financially struggling as the community has lost a great deal of industry. The current mayor, Gary Hartman, echoed these views. The community has become more of a service industry and is made up of low income or poverty level families and individuals. Mr. Anesworth testified that 42 to 45% of the property in the Village is tax exempt (owned by government, or charitable organizations, etc.). Fred Weisser, a Village Trustee, testified that this number is closer to 50%. The Village presented testimony that its primary concern, therefore, is losing more taxable property to the County. The Village’s strategic economic development plan seeks to retain and attract new businesses, expand tourism and reduce the tax burden on residents. The Village claims that the P&C site is the largest undeveloped parcel of real estate within the Village and has potential for development.
Mr. Anesworth also testified, however, that the P&C site had been a difficult site to market. He was aware of no one in his 15 years as mayor that had any interest in developing the property. When the P&C site was operational, it generated about $58,000 annually in tax revenue. Since the shopping center was razed, the tax revenue has been nominal (approximately $5,000 annually). Mr. Anesworth opined that the Route 5 corridor has much greater development potential than the location of the former P&C. The County presented testimony to support this opinion.
The Village also presented testimony describing its need for a payment in lieu of taxes (PILOT) agreement if the jail is constructed at the P&C site, in light of the lost tax revenue and also due to the costs incurred by the Village to provide fire, EMS and police services to the jail and other County facilities. The Village provided an example PILOT agreement entered into by another County with a municipality. The County presented evidence that the County Attorney had advised the County that it could not legally enter into a PILOT agreement *529 with another municipality. Both the County and the Village were provided an opportunity to submit posttrial memoranda on the legality of a PILOT agreement in this case. The County maintains that it may not lawfully enter into a PILOT agreement with the Village relative to the new jail, absent express statutory authority to do so. The Village disputes this position but has failed to identify any statute authorizing such an agreement in these circumstances.
The Village’s third finding provides that “in most counties, the county jail is located in a remote area. The County has a large number of available sites.” There was conflicting testimony presented regarding this finding. Mark Kukuvka, an engineer with 20 years of experience in siting jails, testified that jails are constructed in a variety of settings—urban, residential, historical and rural areas, depending on the needs of the county. The County presented overwhelming documentation regarding its investigation of other sites and the difficulties it had in locating a viable site. The County insists that access to water and sewer services rendered most rural sites unavailable or their distance from the courts made them impractical.
The fourth finding cited by the Village provides that “a jail also takes property off the tax roll, thereby increasing the tax burden on the remaining residents.” The Village presented testimony that the P&C site, as vacant land, currently generates approximately $5,000 in tax revenue to the Village annually. When the shopping center was operational, the site generated close to $60,000 annually, but it has been vacant for many years. The County presented evidence that the County will be taxed an additional $800,000 annually if the existing jail is shut down; $64,000 of this will be allocated to the residents of the Village of Herkimer.
The Village’s fifth finding states that “the County Planning recommendation claimed that this zoning amendment is targeted at one side, but in fact it is based on overwhelming opposition to having a new jail in the Village.” The opposition of residents to having a jail in the Village was well documented by the Village during trial and in the testimony of several witnesses. This opposition has not wavered over the years. County Administrator Wallace testified that there has also been consistent opposition to every other site considered by the County in its siting process since the process began 14 years ago.
*530 In addition to the testimony regarding the viability of several of the 13 sites considered by the County, and the five findings representing the Village’s “legitimate local interests,” the Village presented testimony that the County failed to consider a 32-acre site located at Steuben Hill Road. Anthony Brindisi, current Mayor of the Village of Herkimer, testified that the site is owned by the Village and would be donated to the County. Because of the way this parcel is situated, it would be necessary for the County to seek the creation of a water and sewer district from the Town of Herkimer in order to bring water and sewer services to the site. Mr. Brindisi did not indicate that there was willingness on the part of the Town of Herkimer to create such a water and sewer district. In addition, like the P&C site, donating this land to the County would also mean losing a sizeable parcel of Village property from the tax rolls. Mr. Brindisi also testified that since he took office a year prior to trial, he has expressed a willingness to work with the County on bringing water and sewer services to several other sites under the County’s consideration, but acknowledged that his willingness to cooperate did not trump the host municipality’s ability to refuse to create a water and sewer district.
Decision
In Matter of County of Monroe (City of Rochester), Judge Bellacosa opined:
“The American Law Institute and a great many States have adopted a balancing of public interests approach to resolve such land use disputes (see, 4 Rathkopf, Zoning and Planning, at 53-48, n 17 [4th ed]; Model Land Dev Code §§ 7-301, 7-304, 12-201). This balancing approach subjects the encroaching governmental unit in the first instance, in the absence of an expression of contrary legislative intent, to the zoning requirements of the host governmental unit where the extraterritorial land use would be employed (Rutgers State Univ. v Piluso, 60 NJ 142, 152, 286 A2d 697, 702). Then, among the sundry related factors to be weighed in the test are: ‘the nature and scope of the instrumentality seeking immunity, the kind of function or land use involved, the extent of the public interest to be served thereby, the effect local land use regulation would have upon the enterprise concerned and the impact upon legitimate local inter *531 ests’ (id., 60 NJ, at 153, 286 A2d, at 702). In Orange County v City of Apopka (299 So 2d 652, 655 [Fla App]), the catalogue of potential factors to be considered by the reviewing court was expanded to include the applicant’s legislative grant of authority, alternative locations for the facility in less restrictive zoning areas, and alternative methods of providing the needed improvement (see, Lincoln County v Johnson, 257 NW2d 453, 458 [SD]; Blackstone Park Improvement Assn. v Rhode Island Bd. of Stds. & Appeals, 448 A2d 1233 [RI], supra). Another important factor is intergovernmental participation in the project development process and an opportunity to be heard. Realistically, one factor in the calculus could ‘be more influential than another or may be so significant as to completely overshadow all others’, but no element should be ‘thought of as ritualistically required or controlling’ (Rutgers State Univ. v Piluso, 60 NJ 142, 153, 286 A2d 697, 703, supra).” (Matter of County of Monroe [City of Rochester], 72 NY2d 338, 343 [1988].)
In County of Monroe, the Court of Appeals addressed the applicability of local zoning laws where a conflict arises between two governmental entities. There, the issue was whether the expansion and accessory uses of a county-owned airport located within the City of Rochester were subject to the City’s zoning regulations. Employing the “balancing of interests test,” the Court determined that they weighed in favor of granting the County immunity for the airport’s expansion. The Court of Appeals further extends this immunity in the Matter of Crown Communication N.Y., Inc. v Department of Transp. of State of N.Y. (4 NY3d 159, 168 [2005]), where it held that a private telecommunications company was exempt from the regulations under the Telecommunications Act of 1996, because “the licensing of space to commercial wireless providers is an integral component of the State’s plan of promoting public safety and reducing the proliferation of cellular towers, clearly salient public purposes.”
Lower courts have employed the balancing of interests test in different ways and have found certain factors more important than others, but the general trend is that public interest and public safety concerns in particular are of paramount concern. The Court in County of Monroe relied on Rutgers State *532 Univ. v Piluso (60 NJ 142, 153, 286 A2d 697, 703 [1972]), which held that “there will undoubtedly be cases . . . where the broader public interest is so important that immunity must be granted even though the local interests may be great.”
The first County of Monroe factor is “the nature and scope of the municipality seeking immunity.” In this case, the instrumentality is the County seeking immunity from the Village’s zoning law, in order to comply with the State Commission of Correction’s mandate to build a new county jail. While this court declines to go so far as to say the County is a superior instrumentality, under similar circumstances, other courts have held that “it would be anomalous to permit a small village to frustrate or in any way impede the county in its performance of an essential governmental duty for the benefit of the health and welfare of residents of the entire county.” (County of Westchester v Village of Mamaroneck, 22 AD2d 143, 147-148 [2d Dept 1964]; Westhab, Inc. v Village of Elms ford, 151 Misc 2d 1071 [Sup Ct, Westchester County 1991].)
This court took judicial notice of the second County of Monroe factor, “the kind of function and land use,” as the facts were not in dispute, and required no further proof at trial. The “kind of function and land use” in this case is a county jail. The care and custody of criminals is a function of government and the legislature has delegated this obligation to the counties, as each county is required to maintain a county jail. (Matter of County of Cayuga v McHugh, 4 NY2d 609 [1958]; County Law § 217.)
The third County of Monroe factor, “the extent of the public interest to be served thereby,” is perhaps the most important factor in this case. The proposed facility serves a quintessential governmental function that is mandated by state law and serves to provide for public safety, both as to inmates and the public at large. (See County Law § 217.) The proposed facility will bring the County into compliance with the state mandate and will also provide for the public safety of all County residents, including those who reside in the Village. Where a project serves an overriding public purpose, courts have not hesitated to find the project exempt from the host municipality’s land use regulation. (See Crown at 168 [affirming that the construction of telecommunication towers was exempt from the city’s zoning ordinance due to their “public nature,” noting that subjecting the project to local regulation “could otherwise foil the fulfillment of the greater public purpose of promoting the *533 State’s public safety and environmental goals associated with its telecommunications infrastructure”]; County of Monroe, 72 NY2d at 344-345 [finding expansion of the Monroe County Airport was exempt from local zoning because the airport served a greater public purpose of promoting interstate and intrastate commerce that could be foiled by local land use restrictions]; Town of Hempstead v State of New York, 42 AD3d 527, 529-530 [2d Dept 2007] [holding that the public benefits of the telecommunications tower outweighed the town’s local interests and, therefore, that the project was exempt from local regulation]; Matter of King v County of Saratoga Indus. Dev. Agency, 208 AD2d 194, 200 [3d Dept 1995] [declaring that the agency properly concluded that the benefits inherent in the development of a project necessary to the economic well-being of an area outweighed the local interest to ban the project]; Matter of Town of Queensbury v City of Glens Falls, 217 AD2d 789, 790-791 [3d Dept 1995] [finding that the city’s improvements to its water supply and distribution system was exempt from the town’s zoning regulations].)
As stated above, a county jail serves an essential public purpose. A correctional facility that meets New York State’s requirements for the proper housing of inmates, like the proposed facility at the P&C site, will ensure that the inmates are satisfactorily housed, and that public safety is maintained because of the soundness of the facility, the manageable distance to transport inmates between court facilities, lockup, and the correctional facility, and the procedures in place to oversee inmates. The proposed facility will also serve other public interests, including reducing safety risks to correctional personnel, complying with a state mandate and state law, and replacing a deteriorating correctional facility that does not meet basic Commission building standards. Further, having a new jail in Herkimer County will serve all taxpayers in the County because funds have been saved to construct the jail, and the bond for the facility is projected to be paid within nine years. Mr. Wallace testified that once the proposed facility is built, the taxpayers of Herkimer County will potentially save close to $2 million per year after operational costs.
The fourth County of Monroe factor is “the effect land use would have on the enterprise concerned.” In this case, the Village’s land use regulation precludes the development of any correctional facility within the Village’s boundaries. The effect of the Village’s amendment is to ban jails not only at the P&C *534 site, but from the entire Village. The process of siting this jail, including this litigation, has exceeded 15 years. The Court of Appeals frowns on parochial regulation which “could otherwise foil the fulfillment of the greater public purpose of promoting” the County’s public safety goals and obligations to follow state laws. (County of Monroe at 344; see also Crown.) The Court has declined to find immunity in cases where the host municipality has “effectively tailored its zoning laws to block the placement” (Incorporated Vil. of Nyack v Daytop Vil., 78 NY2d 500, 508 [1991]) of the project or take action which could “result in a court proceeding and even an appeal” delaying the project by “many months, or even years, during which time the . . . problems . . . remain.” (Port Wash. Police Dist. v Town of N. Hempstead, 24 Misc 3d 1235[A], 2009 NY Slip Op 51758[U], *5 [Sup Ct, Nassau County 2009]; Bruenn v Town Bd. of the Town of Kent, 44 Misc 3d 1214[A], 2014 NY Slip Op 51116[U] [Sup Ct, Putnam County 2014].)
In this case, subjecting the County to this land use regulation would require the County to start over again, which would likely mean that the project could be delayed many months or even years while the County would continue to be out of compliance with state law and Commission mandates. In addition, HCJ has been ordered to board out the majority of its inmate population at a substantial cost under a Commission variance as the current jail cannot accommodate the County’s current and future needs. Testimony at trial made it very clear that the availability of water and sewer services is the most challenging of the siting criteria. It is the County’s position that given the limited ability to obtain water and sewer services the jail must be built within the Village limits. Therefore, this land use regulation has a prohibitive effect upon the County’s ability to construct the facility.
The fifth factor in County of Monroe is “the impact of legitimate local interests.” The Village has demonstrated that it has legitimate local interests in not permitting the County to locate the new jail at the P&C site. The Village relies on a list of five factors that were asserted as grounds for amending its zoning ordinance: (1) a jail in the Village would change the character of the Village and detract from the commercial, residential and industrial vibrancy of the Village; (2) taking a large parcel in the Village for a jail would violate the Village’s Strategic Economic Development Plan as the Village has a finite amount of land, and very little room for commercial and *535 industrial development; (3) in most counties, the county jail is located in a remote area and Herkimer County has a large number of available sites; (4) a jail also takes property off the tax roll, thereby increasing the tax burden on the remaining residents; and (5) overwhelming local opposition to having a new jail in the Village.
While the court acknowledges the Village’s concerns, they must be viewed in light of all the circumstances. The existing jail is in the Village of Herkimer and has been in the Village for over 100 years. Further, vacant commercial property is not contributing to the character of the Village or the commercial, residential and industrial vibrancy of the Village. The P&C site has been vacant for over 10 years despite attempts to develop it commercially. The exhaustive 15-year jail siting process reflects that there are not a large number of available viable sites, and though Herkimer County is a rural area, access to water and sewer services makes siting in rural locations extremely difficult. Moreover, proximity to the busiest courts is an important factor in siting the facility, which renders a rural location less desirable. Further, while the Village’s concern about losing taxable property is real, as close to 50% of its property is tax exempt, this site (as vacant land) only generates $5,000 per year in property taxes. Though the Village would collect more in property taxes if the land was developed, there has been little to no interest expressed in developing this site. If the Commission were to shut down the existing HCJ, the entire County will bear the cost of boarding out inmates, $64,000 of which will be apportioned to the Village. This is more than 10 times what the Village currently collects in property taxes for the site. Finally, the County encountered opposition to every site it has considered throughout the 15-year process. Generalized opposition to building the jail cannot be justification for upholding land use regulation as this could result in the jail being zoned out of the entire County. A court will not uphold a zoning restriction when “[t]he intruder cannot perform many of its statutory duties without the use of lands within the territory of the host and other municipalities within the County.” (Town of Caroline v County of Tompkins, 2001 NY Slip Op 40205 [U], *8 [Sup Ct, Tompkins County 2001].)
In summary, this court does not find the Village’s five findings to rise to the level of a “countervailing local interest of substance and significance.” {Id. at *10.) The benefits inherent *536 in the development of a project necessary for the public welfare and safety of an area, a county jail, outweigh the interests of the Village in the banning of such projects from its precincts. (Matter of King v County of Saratoga Indus. Dev. Agency, 208 AD2d 194, 199-200 [3d Dept 1995]; see also Bruenn.)
The sixth County of Monroe factor is “the applicant’s legislative grant of authority.” This court previously determined, prior to testimony, that this factor need not be tried as part of this trial and took judicial notice that the applicant’s legislative grant of authority is pursuant to County Law § 217 which requires each county in the State of New York to maintain a county jail.
“Alternative locations for the facility in less restrictive zoning areas” are to be considered as the seventh factor under County of Monroe. The P&C site is located in the Village’s C-3 zoning district, which permitted development of a correctional facility prior to the Village’s amendment to its Zoning Ordinance. There are no less restrictive zoning districts located within the Village that would allow for a county jail. The County considered more than 40 sites initially in siting this project. Fourteen of those sites met the preliminary criteria and underwent a more thorough review. Three of these sites were evaluated even more comprehensively, including two sites which underwent SEQRA review. These 13 sites were ultimately rejected for various reasons prior to the County settling on the P&C site. In some cases, the costs to develop were excessive due to public utilities or physical constraints on the site. In other cases, environmental studies revealed issues that would render construction more difficult or even impossible. And finally, several sites were rejected due to the refusal of municipalities, including, notably, the Village, to provide water and sewer, or public opposition (which would likely result in refusal to create a water and sewer district), and in one case, rezoning.
In Matter of City of Ithaca v Tompkins County Bd. of Representatives (164 AD2d 726, 729 [3d Dept 1991]), the Court found that the rejection of alternatives “must be construed in light of reason.” (Quoting Matter of Environmental Defense Fund v Flacke, 96 AD2d 862, 864 [2d Dept 1983].) The 11 alternatives rejected were all dismissed due to “reasonable” concerns such as: wetlands, aquifers, wildlife, traffic, zoning, soils, land use, visual and noise impact, etc. The Court noted that “[n]ot every conceivable environmental impact, mitigating measure or *537 alternative must be identified and addressed” (City of Ithaca at 730, quoting Aldrich v Pattison, 107 AD2d 258, 266 [2d Dept 1985]). In Matter of Concerned Homeowners of Rosebank v New York Power Authority (2001 NY Slip Op 40096[U] [Sup Ct, Richmond County 2001]), 60 potential sites were considered and rejected due to the size and vacancy of the site, accommodations for daily operations, environmental impact and tailoring for the specific project. The court focused on the sufficiency of the test used to consider alternatives that led them to arrive at the proposed site, but also noted “the benefits inherent in the development of a project so necessary to the health, safety and welfare (both economic and personal) of the citizenry of the City of New York clearly outweigh strict compliance with local zoning regulations.” (Id. at *16.) While the Village contends there were other available locations, a speculative alternative location does not constitute a viable alternative. (T-Mohile USA, Inc. v City of Anacortes, 572 F3d 987, 998 [9th Cir 2009].)
The eighth County of Monroe factor is “alternative methods of providing the needed improvement.” In its posttrial submission, the Village conceded the unavailability of alternative methods of providing the needed improvement. The Commission has ordered the County to build a new jail.
The ninth and final County of Monroe factor is “intergovernmental participation in the project development process and an opportunity to be heard.” It was undisputed by all witnesses at trial that the County has provided numerous opportunities for intergovernmental participation and an opportunity to be heard, both with respect to public comment opportunities and other opportunities to be heard before the County Legislature and meetings, including outreach with the Village.
After hearing six days of testimony regarding the siting of the new HCJ, what was most impressive to the court was the exhaustive process undertaken by the County in searching for a suitable site. Years of research and debate over where to site this facility, in addition to litigation and resources expended by both sides has proved a frustrating and endless process. Based on the evidence presented at trial, and the posttrial submissions of counsel, this court finds that the balancing of public interests weighs in favor of the County of Herkimer.
In this case, as in County of Monroe, the public safety concerns inherent in operating a safe and functional county jail are analogous to wider public interests, and the extent of the *538 public interest to be served must be weighed in favor of the County. While the Village’s concerns regarding losing taxable Village property are acknowledged, the financial impact on the Village in locating the jail at this abandoned shopping center lot does not outweigh the County’s need to fulfill its statutory obligation to maintain a safe and functional county jail. Additionally, it was established at trial that the financial impact in continuing to board out inmates is more detrimental to the Village than losing this parcel of taxable property. It would be anomalous to allow a small village to impede the County in the performance of an essential governmental duty for the benefit of the health and welfare of the residents of the entire county. (Westhab, Inc. at 1075.) Furthermore, while there may be alternative locations to site the facility, the difficulty in accessing water and sewer services makes viable alternative locations scarce. The grounds cited by the County for rejecting alternative sites were valid and reasonable and the public was offered notice and an opportunity to be heard on these issues. In conclusion, contrary to the Village’s assertion that the selection of the P&C site was political in nature, and its allegation that the County failed to consider other locations, this court finds the County to have completed a thorough, exhaustive and objective review of potential sites for the jail project.
Now therefore, in accordance with the directive of the Appellate Division, and based upon a more complete record, i.e., the evidence presented at trial, the posttrial submissions of counsel and the authority cited above, it is hereby ordered and adjudged that the County of Herkimer is immune from the zoning restrictions of the Village of Herkimer in this matter.